**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

MATT TAIBBI,

                    Plaintiff,

        v.

EOIN HIGGINS and BOLD TYPE BOOKS, a
division of HACHETTE BOOK GROUP, INC.,

                    Defendants.

---

Case No. 1:25-cv-09511-GBD

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION
TO DISMISS PLAINTIFF MATT TAIBBI'S COMPLAINT**

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Leena Charlton
1251 Avenue of the Americas, 42ND Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        leenacharlton@dwt.com

*Counsel for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 3

   A.   Parties ..................................................................................................................... 3

   B.   The Book ................................................................................................................. 3

   C.   Matt Taibbi's Career ............................................................................................... 4

   D.   The Twitter Files .................................................................................................... 6

   E.   The Complaint and Challenged Statements ........................................................... 8

STANDARD OF REVIEW ........................................................................................................ 8

ARGUMENT ............................................................................................................................. 9

I.     THE CHALLENGED STATEMENTS ARE NONACTIONABLE OPINION ................. 10

   A.   Headlines are Not Independently Actionable ...................................................... 10

   B.   The Challenged Statements are Non-Actionable Opinion .................................... 13

II.    PLAINTIFF FAILED TO ALLEGE ACTUAL MALICE ................................................... 20

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*61 Crown Street, LLC v. Kingston Uptown Business Men's Ass'n, Inc.*,
    2020 WL 6047832 (Sup. Ct. N.Y. Cty. Oct. 13, 2020) ...........................................................19

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017) ...............................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................................8, 9

*Biro v. Conde Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012)......................................................................................14

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255, 269 (S.D.N.Y. 2013), *aff'd,* 807 F.3d 541 (2d Cir. 2015),
    *aff'd,* 622 F. App'x 67 (2d Cir. 2015).....................................................................10, 20, 21, 22

*Bobulinski v. Tarlov*,
    758 F. Supp. 3d 166 (S.D.N.Y. 2024)................................................................................20, 23

*Buckley v. Vidal*,
    327 F. Supp. 1051 (S.D.N.Y. 1971)............................................................................................1

*BYD Co. Ltd. v. VICE Media LLC*,
    531 F. Supp. 3d 810 (S.D.N.Y. 2021), *aff'd,* 2022 WL 598973 (2d Cir. Mar. 1, 2022) .........11

*Cabello-Rondón v. Dow Jones & Co.*,
    2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017), *aff'd* 720 F. App'x 87 (2d Cir. 2018) .... *passim*

*Cassava Scis., Inc. v. Bredt*,
    2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ..........................................................................19

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014)..................................................................................................9, 13

*Cummings v. City of New York*,
    2020 WL 882335 (S.D.N.Y. Feb. 24, 2020).............................................................................11

*Fodor v. Berglas*,
    1995 WL 505522 (S.D.N.Y. Aug. 24, 1995).......................................................................22, 25

*Galland v. Johnston*,
    2015 WL 1290775 (S.D.N.Y. Mar. 19, 2015) ..........................................................................14

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)................................................................................................................13

*Goldblatt v. Seaman*,
  225 A.D.2d 585 (2d Dep't 1996) ...........................................................................................20

*Greene v. Health & Hosps. Corp. of City of New York*,
  1995 WL 661111 (Sup. Ct. N.Y. Cty. Mar. 23, 1995) ..........................................................17

*Gross v. New York Times Co.*,
  82 N.Y.2d 146 (1993) ............................................................................................................14

*Gunduz v. New York Post Co.*,
  188 A.D.2d 294 (1st Dep't 1992) ..........................................................................................11

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)................................................................................................................20

*Herbert v. Lando*,
  603 F. Supp. 983 (S.D.N.Y. 1985) ...........................................................................................8

*InkMango, Inc. v. Warren*,
  84 Misc. 3d 1227(A), (Sup. Ct. N.Y. Cty. 2024), *aff'd,* 243 A.D.3d 476 (1st Dep't 2025) ....21

*Jacob v. Lorenz*,
  626 F. Supp. 3d 672 (S.D.N.Y. 2022)....................................................................................15

*Jewell v. NYP Holdings, Inc.*,
  23 F. Supp. 2d 348 (S.D.N.Y. 1998)......................................................................................14

*Kalimantano GmbH v. Motion in Time, Inc.*,
  939 F. Supp. 2d 392 (S.D.N.Y. 2013)......................................................................................9

*Kerik v. Tacopina*,
  64 F. Supp. 3d 542 (S.D.N.Y. 2014)......................................................................................21

*Kesner v. Dow Jones & Co., Inc.*,
  515 F. Supp. 3d 149 (S.D.N.Y. 2021).......................................................................13, 16, 17

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006).....................................................................................................9

*Lynch v. City of New York*,
  952 F.3d 67 (2d Cir. 2020).......................................................................................................9

*Madison v. Frazier*,
  539 F.3d 646 (7th Cir. 2008) .................................................................................................18

iii

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991)...........................................................................................................20, 25

*McManus v. Doubleday & Co.*,
    513 F. Supp. 1383 (S.D.N.Y. 1981).......................................................................................24

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)....................................................................................................................15

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
    2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)........................................................................21

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................................................................20

*Naantaanbuu v. Abernathy*,
    816 F. Supp. 218 (S.D.N.Y. 1993) .........................................................................................24

*Obi v. Amoa*,
    58 Misc. 3d 446 (Sup. Ct. Kings Cty. 2017)..........................................................................15

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986)................................................................................................................21

*Rapaport v. Barstool Sports, Inc.*,
    2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021),
    *aff'd,* 2024 WL 88636 (2d Cir. Jan. 9, 2024) .........................................................................19

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (1977) .............................................................................................................24

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
    774 F. Supp. 3d 688 (S.D.N.Y. 2025), *appeal filed,* 25-868 (2d Cir. Apr. 11, 2025) .............22

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)................................................................................................................20

*St. Louis v. NYP Holdings, Inc.*,
    2017 WL 887255 (Sup Ct. N.Y. Cty. Feb. 6, 2017) ...............................................................11

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010)......................................................................................................9

*Steinhilber v Alphonse*,
    68 N.Y.2d 283 (1986) .............................................................................................................14

*Suozzi v. Parente*,
    202 A.D.2d 94 (1st Dep't 1994) .............................................................................................17

*Test Masters Educ. Servs. v. NYP Holdings, Inc.*,
    603 F. Supp. 2d 584 (S.D.N.Y. 2009).....................................................................................10

*Thomas v. Westchester Cnty. Health Care Corp.*,
    232 F. Supp. 2d 273 (S.D.N.Y. 2002).....................................................................................9

*Weber v. Multimedia Ent., Inc.*,
    2000 WL 526726 (S.D.N.Y. May 2, 2000) ............................................................................25

*Wexler v. Dorsey & Whitney, LLP*,
    2019 WL 5485265 (E.D.N.Y. Oct. 25, 2019), *aff'd*, 815 F. App'x 618 (2d Cir. 2020) ..........19

*White v. Berkshire-Hathaway*,
    10 Misc. 3d 254 (Sup Ct. Erie Cty. 2005) ..............................................................................11

*Wright v. Belafonte*,
    2014 WL 13111397 (S.D.N.Y. Mar. 11, 2014),
    *report and recommendation adopted*, 2014 WL 1302632 (S.D.N.Y. Mar. 31, 2014),
    *aff'd,* 687 F. App'x 1 (2d Cir. 2017)......................................................................................25

## Other Authorities

Fed. R. Evid. 201(b).......................................................................................................................3

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1, 8

Defendants Eoin Higgins and Bold Type, a division of Hachette Book Group, Inc. ("Hachette") (collectively, "Defendants") respectfully submit this memorandum of law in support of their Rule 12(b)(6) motion to dismiss Plaintiff Matt Taibbi's complaint with prejudice.

## PRELIMINARY STATEMENT

In February 2025, Defendant Bold Type—an imprint of Basic Books Group, a division of Hachette—published *Owned: How Tech Billionaires on the Right Bought the Loudest Voices on the Left* by Defendant Eoin Higgins (the "Book"). The Book explores the rise of tech billionaire influence in the media industry, such as Elon Musk's purchase of Twitter or Marc Andreesen's investments in Substack, and the curious phenomenon of former leftwing journalists, Glenn Greenwald and Matt Taibbi, working alongside or in coordination with these rightwing billionaires. Based on a detailed recitation of both the journalists' careers and the public rise of the billionaires' influence, Higgins concludes that several factors like age, personal politics, Gen X ethos, and scandal led to Taibbi's political shift. Financial benefits, the Book makes clear, were at most a byproduct of his choices. Despite this thorough analysis—relying on Plaintiff's own writing, public statements, and interviews, and Higgins's discussions with other journalists and academics—Plaintiff sued Defendants for one count of defamation *per se*, based on the Book's cover and selected statements in the work. Defendants now move to dismiss Plaintiff's plainly unfounded action with prejudice.

In filing this Complaint, Matt Taibbi places himself within the annals of defamation litigation: an upset writer, whose own career depends on the protection of the First Amendment, using the courts to suppress the speech of his political opposite. Like in *Buckley v. Vidal*, Taibbi has apparently forgotten that "when an author submits his work to the public, he must, of necessity, expect criticism of that work... no matter how hostile such criticism may be." 327 F. Supp. 1051, 1052 (S.D.N.Y. 1971). There, Buckley's attempt to silence Vidal failed, and in the half century

since, the law has not changed. Taibbi's action fails for several independent reasons.

*First*, Taibbi alleges that the Book's title "falsely state[s] that Plaintiff was 'owned' and 'bought' by billionaires" and that the cover's illustration (a hand holding a pen and supported by several strings) depicts "puppeteers' strings" that suggest he is a "puppet[] to billionaires." Compl. ¶¶ 3, 17. Putting aside Plaintiff's inflexible reading, the Book's cover is not actionable as it is a fair index of its contents and fully protected opinion. The colorfully-stated title addresses one of the Book's central questions: how Greenwald and Taibbi, once darlings of the political Left, found success on the Right. Political disagreement does not state a viable legal claim.

*Second*, Plaintiff challenges a small selection of words or phrases from the Book, while ignoring the full statements and actual context in which they appeared. At the same time, he does not challenge the underlying facts that inform the conclusions he strains to challenge. For example, Plaintiff alleges that it is defamatory for Defendants to state he "cash[ed] in" or received a "windfall" after the Twitter Files, because he did not "directly" monetize the Twitter Files on Twitter. Compl. ¶ 14. But, such statements are nonactionable opinions based on disclosed and undisputed facts. Plaintiff does not deny that after the Twitter Files—an important inflection point in his career—he gained thousands of followers on Elon Musk's Twitter, as well as thousands of paid subscribers on his Substack. Thus, it is undeniably protected speech for Defendants to describe these benefits as, *e.g.*, a "windfall."

*Finally*, Plaintiff's failure to allege actual malice is an independent basis for dismissal. Plaintiff does not dispute that the Book, including the depiction of him, rests on a wealth of documented sources, previously published interviews and public records.  He alleges not a single fact to support that either Defendant knew the challenged statements were false or had any doubt about their accuracy, let alone facts that meet the required clear and convincing standard. Instead,

the Complaint merely alleges that the work was not fact-checked, or that "Higgins had not interviewed Plaintiff" (when the Book makes clear that he declined an interview), or that Higgins somehow "admitted" the Book is false (when the cited interviews prove the opposite). None of these allegations begin to meet Plaintiff's high burden of pleading actual malice.

To quote Matt Taibbi, "To small thinkers, free speech is a wilderness of potential threats. Thankfully, America wasn't founded by small thinkers."[1] It is because of this free speech ethos that his Complaint must be dismissed.

## FACTUAL BACKGROUND

### A.    Parties

Plaintiff Matt Taibbi is an "award-winning" journalist and author, well-known for his reporting on the Twitter Files. Compl. ¶¶ 7, 23. Defendant Eoin Higgins is a historian, journalist, and author of *Owned: How Tech Billionaires on the Right Bought the Loudest Voices on the Left.* Compl. ¶¶ 1, 8. Defendant Bold Type Books, which is an imprint of Basic Books Group, a division of Hachette, published *Owned* in February 2025.

### B.    The Book

The Book's introduction lays out its general thesis and provides a roadmap for how it will explore the work's central themes. As is made clear from the outset, the Book engages in a political argument that provides "an alternative history of the last quarter century from the point of view of the left that felt out of step with both the Bush and Obama eras and struggled with defections and conversions under Trump and Biden." Book at 11. It explains that the "story begins in the 1990s" with the "rise of the new tech companies" and examines how "Silicon Valley elites"—particularly

---

[1] Matt Taibbi, "How to Fight Back Against the Censors," The Free Press, October 01, 2024, *available at* https://www.thefp.com/p/matt-taibbi-censorship-free-speech-rescue-the-republic.  The Court may take judicial notice of Taibbi's public writings, as they are "not subject to reasonable dispute."  Fed. R. Evid. 201(b).

tech leaders Andreessen, Musk, and Peter Thiel—"worked to 'disrupt' the media space to their own benefit." *Id.* at 10-11. These tech billionaires created an alternative "media ecosystem" with Musk's purchase of Twitter, Andreesen's investments in Substack, and Thiel's expansion of Rumble. *Id.* at 9-10. The Book describes how the "tech elites and formerly left-wing journalists [including Glenn Greenwald and Plaintiff Matt Taibbi] forged an informal alliance." *Id.* at 12. The Book argues that Greenwald and Taibbi "partnered with those who only want certain kinds of speech and any critique [of them] disappeared," effectively choosing "personal preservation over cause." *Id.* at 13. "Ultimately, *Owned* is a meditation on the question of power," and is not so much "concerned with asking why [Greenwald and Taibbi] made that choice. Its purpose is to point out how the rest of us can avoid being bought." *Id.*

### C.    Matt Taibbi's Career

The Book discusses Taibbi's history and his shifting alliances in a few chapters. It grounds Taibbi's career trajectory with scores of sources—including Taibbi's own writing, public statements, interviews, and testimony, as well as published articles and commentary about Taibbi, and Higgins's own conversations with other reporters and academics—all meticulously identified in the Book's extensive footnotes. Book at 251-280. Higgins repeatedly sought to interview Taibbi, though he declined. *Id.* at 197 ("When reached via email for comment, Taibbi initially responded with two words: 'Lol. Pass.'"); *see also, id.* at 238. Despite his refusal, the Book is peppered with Taibbi's responses to various critiques, as publicly available. *Id.* at 124-25, 129, 136-37, 198-202. Taibbi does not deny any of these underlying facts.

As Higgins documents, Taibbi began his writing career in post-Soviet Russia writing for *The Moscow Times*, *Living Here*, and *The eXile*. Book at 117-119, 121.  In the early 2000s, Taibbi returned to the U.S., eventually working for *Rolling Stone*, where he covered the 2007-2008

financial crisis, "primarily target[ing] big banks and the excesses of Wall Street." *Id.* at 122-23. As Higgins writes, "Taibbi's profane but well-researched writing was a breath of fresh air." *Id.* at 123. It was at *Rolling Stone* that Taibbi catapulted to fame with his vivid description of Goldman Sachs as "a great vampire squid wrapped around the face of humanity, relentlessly jamming its blood funnel into anything that smells like money." *Id.* Clearly, back then, Taibbi did not dwell in literalism and understood the power of a good metaphor.

After a brief foray to *The Racket* (owned by eBay billionaire, Pierre Omidyar), Taibbi returned to *Rolling Stone*, where he covered the Trump campaign and Russiagate. *Id.* at 125-26. But "[b]y rejecting Russiagate, Taibbi was accused by liberals of taking the side of Trump and the Kremlin." *Id.* at 127. As he attempted a "soft reboot with his liberal audience" with a book on Eric Garner and the Black Lives Matter movement, his promotional tour was tainted when "scandal hit as his old misogynistic writings resurfaced." *Id.* The scandal was eventually traced back to a "rightwing thinker" and, as the Book reports, the specific claims were disproved, with one woman describing them as "ridiculous." *Id.* at 129. But, his left-leaning audience continued to dwindle and, Higgins argues, "Taibbi turned to a new right-wing audience" and "became increasingly beholden to their priorities." *Id. See also id.* at 9 ("Over the Trump and early Biden years,… Matt Taibbi watched [his] audience[] move to the right. [He] embraced this change and the adulation and fame that followed."). Yet, the Book acknowledges that "Taibbi may have never had firm ideological commitments, at least not to the left." *Id.* at 130.

In 2020, Taibbi decamped from *Rolling Stone* for Substack—a subscription-based platform, funded in part by billionaire Marc Andreesen, who had begun to shape Substack into a rightwing-friendly safe haven. *Id.* at 10, 132-34, 145. By 2023, Substack was platforming openly neo-Nazi content. *Id.* at 136. When asked about this troubling content, "Matt Taibbi took aim [at

the reporter, Katz], calling him a 'tireless busybody.'" *Id.* at 137. Taibbi does not deny, as the Book reports, that at Substack he found "huge success" and has "made millions from his self-published work on the site." *Id.* at 134. Again, Taibbi denies none of these facts.

### D.    The Twitter Files

In 2022, Elon Musk bought Twitter, promising to expose the "rot at [its] core … particularly to his critics on the left and his friends on the right," and Twitter quickly became a "venue for rightwing speech." *Id.* at 181. To that end, Musk sought reporters to review Twitter's internal communications and documents, and billionaire David Sacks "suggested Musk approach Matt Taibbi." *Id.* at 182. Taibbi accepted the task and, with great fanfare, released the Twitter Files in December 2022. *Id.* Taibbi does not deny he was chosen by Musk for the Twitter Files and has admitted his access was based on "certain conditions," including publishing first on Twitter.[2] The Book argues that this alignment with Musk was when Taibbi "fully dispensed with any pretense of challenging power." *Id.* at 182.

Taibbi's first release in the Twitter Files covered Twitter's handling of the Hunter Biden laptop story. Higgins asserts that, at most, the story "showed a flawed but exhaustive effort on the part of Twitter executives to manage the fallout and attempt to make the right determination." *Id.* at 183. And, as the Book reports, "Taibbi later admitted there was no evidence of government involvement in the laptop story decision." *Id.* at 183 (quoting Taibbi's own tweets). Nonetheless, "right-wing actors supported the reporting, lending Taibbi their platforms and hyping the story." *Id.* at 185. At the same time, noting that the Twitter Files rested on Musk's "cherry-picked documents," Taibbi's "[c]ritics argued that Taibbi and Musk, by working together, had actually

---

[2] Matt Taibbi, Note to Readers, Racket News, December 2, 2022, *available at* https://www.racket.news/p/note-to-readers-8d4.

deployed a coordinated leak rather than a neutral release of information." *Id.* at 183, 186. Or, as another commentator observed, Taibbi was "volunteering to do online PR work for the world's richest man on a Friday night, in service of nakedly and cynically right-wing narratives." *Id.*

During this period of widespread controversy surrounding the Twitter Files, and despite growing criticism of Musk's free speech principles, Taibbi, in his own words, "repeatedly declined to criticize" him. Book at 195 n.1 (citing April 10, 2023 messages from Taibbi to Musk). Instead, he publicly celebrated Musk for "spen[ding] 44 billion dollars to become a whistleblower of his own company." *Id.* at 196 (citing Joe Rogan Experience podcast, Episode 1940). While no one suggested that Taibbi was paid by Musk for the work, Taibbi does not challenge the Book's observation that, corresponding with the release of the Twitter Files, his "Twitter accounts blew up, and his Substack—already incredibly successful—gained thousands of subscriptions." *Id.* at 186.

At the same time, as the Book makes clear, Taibbi bristled at any suggestion that he was being "spoon-fed" information from Musk and called it "ridiculous" that he was going easy on Twitter. *Id.* at 198-202. Ultimately, Taibbi ended up as a "star witness[]" at a Republican Congressman's hearings on the Twitter Files.[3] As the Book argues, "Taibbi's alliance with House GOP members like Jordan shows that the desire for attention and material benefit tempers any sense of challenging power." *Id.* at 205.

---

[3] At the hearings, Taibbi was questioned concerning his growth in Twitter and Substack followers after the release of the Twitter Files. While he tried to evade the questions, he did not deny that his followers and subscriptions increased. Book at 202, n.17; *see also* Hearing on Twitter Documents About Content Moderation, House Judiciary Select Subcommittee on the Weaponization of the Federal Government, March 9, 2023 at 48:39 to 52:10, *available at* https://www.c-span.org/program/house-committee/hearing-on-twitter-documents-about-content-moderation-decisions/625051).

### E.    The Complaint and Challenged Statements

On November 13, 2025, Plaintiff filed this Complaint asserting one count of defamation *per se* against Defendants alleging the Book "accuse[s] Plaintiff of corruption, dishonesty, and unethical conduct in his profession." Compl. ¶¶ 2, 35-38.  In support of this generalized contention, the Complaint primarily focuses on the Book's cover and alleges that the cover illustration falsely suggests that Plaintiff (and journalist Glenn Greenwald) "are puppets to billionaires," *id.* ¶ 3, while the Book's title and subtitle falsely state that "Plaintiff was 'owned' and 'bought' by billionaires." *Id.* ¶ 17. Beyond the cover, the Complaint cherry-picks random words or phrases from the Book and alleges that it "falsely claims" that Taibbi "cashed in" with Musk, received a "windfall" and "fully dispensed with any pretense of challenging power in 2022." *Id.* ¶¶ 18-19. That is it.[4]

Plaintiff alleges that Defendants acted with "actual malice" because 1) they "published…knowing that Higgins had not interviewed Plaintiff or consulted available evidence," 2) Hachette "failed to fact-check the Book," and 3) Higgins "admitted" in post-publication interviews that the Book's subtitle or "central thesis" was "unsupported." Compl. ¶¶ 5, 25, 27, 29, 34. Plaintiff alleges damages in excess of $1,000,000. *Id*. ¶ 38.

### STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw

---

[4] Plaintiffs are required to allege defamatory statements with specificity. *See Herbert v. Lando*, 603 F. Supp. 983, 990 (S.D.N.Y. 1985) ("a defamation plaintiff does not satisfy the requirements of notice pleading unless he specifically alleges the words said to be actionable") (citing cases). Here, Plaintiff not only fails to provide any context or a complete identification of these alleged challenged statements, but he also implies there are additional statements but does not identify them at all. Compl. ¶ 4 ("These allegations amongst others littered throughout the Book are provably false…."). Statements that are not specifically identified are not the subject of this litigation.

on its judicial experience and common sense." *Id.* at 679. The court "is required to accept all 'well-pleaded factual allegations' in the complaint as true." *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020). "'[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' however, dismissal is appropriate." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (citing *Iqbal,* 556 U.S. at 1950). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (citing *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d. Cir. 2002)). On a motion to dismiss, "the Court may consider documents…incorporated by reference, documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). Here, of course, the Book is incorporated into, and central to, Plaintiff's Complaint.

"Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013) (cleaned up), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

## ARGUMENT

Plaintiff has failed to state a cognizable defamation claim, and his Complaint must be dismissed. In New York, a plaintiff must allege: "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability."[5] *Chau v. Lewis*, 771 F.3d 118, 126–27

---

[5] Statements are defamatory *per se* if they "charg[e] an individual with a serious crime" or "tend[] to injure another in his or her trade, business, or profession." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 419 (S.D.N.Y. 2013) (omitting citations).

(2d Cir. 2014) (citing *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 176 (2d Cir. 2000)). As a public figure, as he recognizes he is, Plaintiff must adequately allege actual malice, rather than negligence or gross irresponsibility. *See Biro v. Conde Nast*, 963 F. Supp. 2d 255, 269 (S.D.N.Y. 2013), *aff'd,* 807 F.3d 541 (2d Cir. 2015), and *aff'd,* 622 F. App'x 67 (2d Cir. 2015). The Complaint should be dismissed with prejudice because 1) the cover is a fair index of the Book's content, 2) all challenged statements are nonactionable opinions based on undisputed and disclosed facts, and 3) Plaintiff has utterly failed to allege clear and convincing evidence that the challenged statements were published with actual malice.

## I.    THE CHALLENGED STATEMENTS ARE NONACTIONABLE OPINION

The Complaint rests almost entirely on a strained and ultimately unfounded contention that the Book's cover and title accuse Taibbi of literally being "owned" and "bought" and thereby accuse him of "dishonesty, corruption, and unethical conduct." Compl. ¶¶ 3, 4, 17. Seeking support for this construct, the Complaint plucks out a few words from a 247-page book, but fails to address the context of the entire work—as it must—or deny the factual foundations for the Book's conclusions. In the end, the Complaint takes aim only at the Book's conclusions; not its facts. While Taibbi may dislike and disagree with Higgins's opinions, they are fully protected and the Complaint fails to state a legal claim.

### A.    Headlines are Not Independently Actionable

In New York, the law is clear that a headline or title is not actionable so long as it is a "fair index of the substantially accurate material included" in the book. *Test Masters Educ. Servs. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) (internal quotations omitted). Under this standard, Defendants "need not choose the most delicate words available in constructing its headline." *Id.* at 589. Rather, "it is permitted some drama in grabbing its reader's attention." *Id.* (using "Scam" in headline was fair index of article that explained the Consumer

Protection Bureau had investigated the company and demanded that it provide refunds); *see also Gunduz v. New York Post Co.*, 188 A.D.2d 294, 294 (1st Dep't 1992) (headline, "Public Enemy No. 1" was non-actionable fair index of article even though plaintiff, a taxi cab driver, had not committed a crime). That is, even if a headline or title is "unfortunate, sensationalist and drafted simply to garner attention," it is not actionable where it is a "fair index of the underlying" text. *St. Louis v. NYP Holdings, Inc.*, 2017 WL 887255, at *2 (Sup Ct. N.Y. Cty. Feb. 6, 2017) (headline "Drunk driving-pothead thinks he's fit to be a corrections officer" was non-actionable because the article itself made clear that marijuana charges against the plaintiff were dropped). "This threshold question is one of law for the court, not a question of fact for a jury." *White v. Berkshire-Hathaway*, 10 Misc. 3d 254, 255 (Sup Ct. Erie Cty. 2005) (internal citations omitted); *see, e.g.*, *Cabello-Rondón v. Dow Jones & Co.*, 2017 WL 3531551, at *6 & n.3 (S.D.N.Y. Aug. 16, 2017), *aff'd* 720 F. App'x 87 (2d Cir. 2018).

Plaintiff cannot, as his Complaint suggests, rely on the Book's title and illustration in isolation to state a claim for a most basic reason: The cover does not identify him. Under New York law, "a headline that does not directly name the plaintiff is not independently actionable." *White*, 10 Misc. 3d at 256; *Cummings v. City of New York*, 2020 WL 882335, at *23 (S.D.N.Y. Feb. 24, 2020) (explaining "the headline—standing alone—is not independently actionable because it does not mention [p]laintiff by name" and "can only be construed in conjunction with the article"). Because Taibbi is not named, even "to understand that the headline referenced [Plaintiff], a reasonable reader would have to read the [book], and in doing so would understand the full context and the hyperbolic nature of the language." *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 820–21 (S.D.N.Y. 2021), *aff'd,* 2022 WL 598973 (2d Cir. Mar. 1, 2022). Thus, the cover is not independently actionable.

11

The Book's cover, considered in context, is a fair index of the Book's central thesis. From its opening pages, the Book clearly previews its political argument on the societal consequences of billionaires coopting platforms of public discourse to give voice to their personal views. Compl. ¶ 3. Within this history, it explores how journalists can fall sway to the public acclaim and economic benefits resulting from alliances with these billionaires. Like any good political exegesis, the Book considers many moving pieces and recognizes the opposing arguments and perspectives. It is not depicting a sinister, corrupt enterprise, but something far more subtle and nuanced—the battle to "control[] the new media" waged by tech billionaires was not won with illegal payments or the "buying" of journalists, but instead by providing a "path to professional preservation" that allowed journalists like Greenwald and Taibbi to move to the right along with their audiences and embrace the adulation and fame that followed. Book at 4-5. The Book's title and cover are nothing more than attention-grabbing metaphors to reflect a broader argument.[6]

In support of this thesis, Higgins meticulously plots numerous factors and theories to explain Taibbi's rightward shift. For example, Higgins speculates that a dwindling liberal audience was a practical reason for his ideological shift, *i.e.*, he went where he was welcome. Book at 9-10, 126-30. He acknowledges that Taibbi "may have never had firm ideological commitments, at least not to the left." *Id.* at 117 ("Gen X lacks real politics"); *see also id.* at 118, 126-27, 130-31. He also proffers that "Taibbi's politics, steadily more shaped by his identity as an older white man are running into a brick wall of preferred pronouns, more thoughtful sexual politics, and racial awareness." *Id.* at 131, *id.* at 240 ("It's also about getting older, having your politics change, and being unable to confront that in an honest way."), *id.* at 201, 245-46. Plaintiff does not dispute any

---

[6] Indeed, as Plaintiff himself alleges, Higgins does not *ever* identify any payment or clandestine transaction that could support the challenged phrases as accusations of financial corruption. Compl. ¶ 31 ("When asked to provide his best 'Smoking gun' evidence of such corruption, Higgins repeatedly declined to offer any example of financial corruption on Plaintiff's part"). The reason is simple:  in context accusations of such corruption cannot be reasonably understood.

of these theories.

Nor does Taibbi dispute, nor could he, as the Book documents, that the subject and theories of his writing have changed or that his rightward shift coincided with the tech billionaires' increased influence over media. He certainly cannot deny that this shift was noticed by billionaires who handpicked him to report out the Twitter Files with "certain conditions." And Taibbi does not dispute that his Twitter Files reporting largely mirrored Musk's own beliefs and conclusions and, at the same time, his public profile and followers rose drastically. Book at 196, 199.

In short, "owned" describes the media landscape as it is falls further under the control of billionaires, and "bought" describes Taibbi's position within a complicated system that ultimately resulted in his shifting politics—at least according to his critics on the Left. Regardless of the provocative language and imagery, the Book's cover is not actionable since it is a fair index of its contents and fully protected opinion.

### B.    The Challenged Statements are Non-Actionable Opinion

All the statements at issue are constitutionally protected opinion, reflecting Higgins's characterization of, or speculation about, Taibbi's career. The United States Supreme Court has held that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). Hence, opinions are protected by the First Amendment. And actions are routinely dismissed up front when opinions, not facts, are challenged since the fact/opinion dichotomy is a question of law for the court. *See*, *e.g.*, *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 170 (S.D.N.Y. 2021) (dismissing on 12(b)(6) motion, "Whether a challenged statement is an opinion is a question of law"); *Chau*, 771 F.3d at 128 ("only factual statements are actionable ….").

New York "has embraced a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more protective [than the Federal standard] of the cherished constitutional guarantee of free speech." *Gross v. New York Times Co.*, 82 N.Y.2d 146, 152 (1993). That test considers:

> (1) whether the specific language in issue has a precise meaning which is readily understood;
> (2) whether the statements are capable of being proven true or false; and
> (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to 'signal' … readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Id.* at 152-53. Under this test, a "'pure opinion' is a "statement of opinion which is accompanied by a recitation of the facts upon which it is based." *Steinhilber v Alphonse*, 68 N.Y.2d 283, 289 (1986). "[T]his class of statements" is fully protected, as it "provides…the full context of the communication signal[ing] readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross*, 82 N.Y.2d at 154.

The law is clear that a defamation claim will not survive dismissal when a plaintiff does not dispute the facts upon which a challenged opinion is based. *See Cabello-Rondon*, 2017 WL 3531551, at *5–6 (where "plaintiff appears to seek every possible route around the essential fact that he does not claim that defendant's statements were false," he has failed to state a claim for defamation) (cleaned up); *Galland v. Johnston*, 2015 WL 1290775, at *6 (S.D.N.Y. Mar. 19, 2015) (dismissing claim where plaintiff did not dispute fact upon which defendant premised her opinion); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998) (where plaintiff "only asserts that the opinions are false, and does not challenge the veracity of the underlying facts, [it] may not sustain a libel action.").

Finally, courts have also "afforded constitutional protection to the type of speech often characterized as 'rhetorical hyperbole,' 'parody,' 'loose,' or 'figurative.'" *Biro v. Conde Nast*, 883

14

F. Supp. 2d 441, 460–61 (S.D.N.Y. 2012). This principle "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' [that] has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990) (citation omitted).

Here, beyond his focus on the Book's cover—addressed above—Taibbi challenges selected words or phrases that he claims suggest he wrongly benefitted financially from the Twitter Files—*i.e*., he "cash[ed] in," made a "windfall," his Twitter account "exploded" or that he "fully dispensed with any pretense of challenging power in 2022." *See, e.g.,* Compl. ¶¶ 2, 18, 19.[7] Though the Complaint presents the challenged phrases in isolation—often challenging a single word plucked from its context—they are part of the Book's larger political discourse concerning the systemic rise of tech billionaires' financial influence in media, using Taibbi's unexpected career trajectory as an example. Book at 9, 13. That context alone signals that the challenged statements are Higgins's opinions, and not statements of inalienable fact. *See Obi v. Amoa*, 58 Misc. 3d 446, 452 (Sup. Ct. Kings Cty. 2017) ("When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact.").

Importantly, the Book and these (fractured) statements are grounded in Taibbi's own words and actions, which Plaintiff does not dispute and which undergird Higgins's overarching thesis

---

[7] The Complaint alleges without any citation that the Book reports that Taibbi "concealed stories" or "acted unethically," Compl. ¶ 18, but no such statements appear in the Book. Plaintiff also refers to statements evidencing Defendants "basic disregard for elementary fact," but does not appear to actually challenge them as defamatory. *See Id.* ¶ 23 ("ignored the story that 'the Trump administration routinely demanded material be taken down' by Twitter'"), ¶ 26 ("Plaintiff early in his career 'largely went after GOP politicians, and hardly seemed a threat to Democrats or the left.'"), ¶ 27 ("Unlike Taibbi, [Bari] Weiss used Musk rather than being used by him and spun the Twitter Files into an independent career move."). Considered in context, the Book explains the basis for each of these statements with additional facts that Plaintiff again does not dispute. Furthermore, even if they were false, they hardly have a defamatory meaning. *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 689 (S.D.N.Y. 2022)(" A plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication.").

that Taibbi's career fits neatly into a system that was coopted by rightwing tech billionaires. *See Kesner*, 515 F. Supp. 3d at 179 ("Kesner does not dispute these facts. Drawing on them, Buhl opined that they 'could signal' an SEC charge of or settlement with Kesner.").

Specifically, the full statement—that "[a]fter years of confrontational commentary on the financial industry and questioning the mainstream, **Taibbi fully dispensed with any pretense of challenging power late in 2022.** And he did so to gain access"—is Higgins's opinion of Taibbi's Twitter Files reporting. Book at 182. Plaintiff does not dispute that his "past work legitimize[d] him," helping him "compete for limited eyeballs and dollars on monetized platforms." *Id.* at 242. He cannot dispute that he caught the attention of Elon Musk, the wealthiest man in the world, who offered him conditional access to the Twitter Files. Or that his reporting mirrored Musk's public sentiments about Democratic and leftwing corruption, gaining Taibbi further support from the right. Thus, the challenged statement succinctly describes these facts as an inflection point in Taibbi's transition from an anti-establishment, left leaning journalist stridently critiquing the global finance system into a pundit cozying up to Elon Musk and arguing that only the Right fully embraces free speech.

Similarly, the phrases "cash[ed] in," "windfall," and "exploded" reflect a pointed perspective on the outcomes of Taibbi's Twitter Files reporting. For example, Higgins uses the phrase "cash in" only once in reference to Taibbi. He writes that:

> [T]heir adoption of conservative politics was an attempt to ingratiate themselves with the tech leaders who fund the platforms on which they both now depend to make their money. Both Greenwald and Taibbi were eager to work in the venues that their new funders were promoting. **Taibbi's Twitter Files reporting is a perfect example: he spent decades building up credibility and credentials only to, in one high-profile moment, cash in to launder a CEO's cherry-picked corporate opposition file on his opponents.**

Book at 9-10.  In context, he is clearly referring to Taibbi giving up or sacrificing his reputation with the Left in order to gain access to the Right, and not referring to any specific financial benefits

16

or transactions, as Plaintiff suggests.

The phrases "windfall" and "exploded" also are taken out of context and are simple descriptions of objective outcomes that Plaintiff does not dispute. Again, the Book observes the effect of Taibbi's Twitter Files reporting: he very publicly fell in line with Musk and his influence increased. *See* Book at 186 ("His Twitter account blew up, and his Substack—already incredibly successful—gained thousands of subscriptions. The reporting generated a financial **windfall** for the writer, even if its findings were dismissed by more sober commentators."); *Id.* at 195-95 ("His Substack had **exploded** after the Twitter Files reporting and he'd promised to continue exposing censorship of the social media site."). He even admits in the Complaint that his livelihood now relies on his Substack subscriptions.[8] Compl. ¶ 12.

Nothing in the Book supports the Complaint's contention that Higgins is accusing Taibbi of "financial corruption." Compl. ¶ 31. Indeed, Higgins does not identify any one-for-one payout or transaction from any billionaire to Taibbi and explicitly acknowledges that financial incentives are not the only driver of Taibbi's conduct. *See, e.g.*, Book at 126-27 ("Taibbi wasn't the only liberal victim of the right wing's weaponization of Me Too to settle scores with former ideological opponents."), *id.* at 240 ("It's also about getting older, having your politics change…."), *id.* at 201, 245-46. "[A]t most, [he] suggests that plaintiff took advantage of his…connections to gain some…benefit." *Suozzi v. Parente,* 202 A.D.2d 94, 100-01 (1st Dep't 1994). But "'[i]n the absence of some clear assertion of criminality' such an accusation is not defamatory and does not constitute libel per se." *Id*; *see also Greene v. Health & Hosps. Corp. of City of New York*, 1995 WL 661111,

---

[8] To the extent the Complaint alleges defamation by implication, it also fails because Plaintiff does not allege that Higgins intended or endorsed the defamatory implication. In fact, the post-publication interviews cited in the Complaint show the opposite. *See* Compl. ¶¶ 21, 30-31; *Kesner*, 515 F. Supp. 3d at 170  (for a defamation by implication claim based on true facts, plaintiff must "make a rigorous showing that the language of the communication[s] as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference.") (citing *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37–38 (1st Dep't 2014)).

at *3 (Sup. Ct. N.Y. Cty. Mar. 23, 1995) (refusing to strain to find defamatory meaning where there is no "clear allegation of any criminal conduct") (citation omitted).

To be sure, Plaintiff does identify certain facts he *believes* undermine Defendants' conclusions, but those facts do not negate Defendants' opinions or the facts they rely on. For example, Plaintiff alleges that he "has never accepted money, employment, or inducement from Elon Musk or any other conservative billionaire." Compl. ¶ 13. He also alleges that he "refused Musk's offers to monetize content directly on Twitter…citing ethical concerns." [9] *Id.* ¶ 14. But the Book does not state that Taibbi concealed stories, acted unethically, accepted money from Musk, or monetized his reporting "directly on" Twitter, *id.* ¶ 14, it simply asserts that he accepted Musk's offer to report out the cherry-picked Twitter Files and benefited from a noticeable increase in Twitter followers and Substack subscribers after the Twitter Files.

At worst, the reader could conclude that Higgins believes Taibbi "sold out" or chose the path of least resistance. *See* Compl. ¶ 2 ("The Book falsely portrays Plaintiff Matthew Taibbi, an award-winning journalist, as having "cashed in" with Elon Musk, sold out his professional ethics..."); Book at 5 ("Rather, they are seen on the left as traitors:  right-wing warriors who have sold out to conservative media.").  But courts have found such statements are "merely an opinion." *Madison v. Frazier*, 539 F.3d 646, 657 (7th Cir. 2008) ("We find that the phrase 'sell out' is incapable of being verified as a statement of fact"). Even accusations or name-calling such as "'fraud' (someone who is not the type of person they present themselves to be), a 'hack' (someone who is motivated entirely by money, often at the expense of integrity or professional standards),

---

[9] Similarly, Plaintiff alleges that "during two months of peak public interest in the project, Plaintiff lost money for the first time in his career as an independent journalist while he published his work for free on Twitter." Compl. ¶ 15. But, even accepting this as true, this momentary loss does not negate the Book's conclusions, which look at Taibbi's career with a much broader lens.  Importantly, Taibbi has not denied that his Twitter/Substack followers increased or that overall he has made millions from his Substack. *See, e.g.*, Book at 134.

or a "wannabe" (someone who aspires vainly to emulate or attain success)" cannot form the basis of a defamation claim, as they "suffer from the same defect… they are readily understood as inherently subjective assessments that are incapable of being proven objectively false." *Rapaport v. Barstool Sports, Inc*., 2021 WL 1178240, at \*14 (S.D.N.Y. Mar. 29, 2021), *aff'd,* 2024 WL 88636 (2d Cir. Jan. 9, 2024).

Finally, even if the Book could be reasonably read as conveying that Taibbi's political shift was largely motivated by money—which belies the actual language of the work—that speculation would be insufficient to sustain Plaintiff's defamation claim, as commenting on a plaintiff's "incentives" are matters of opinion. *Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, at \*14 (S.D.N.Y. Mar. 28, 2024) ("In this context, whether there exist 'powerful incentives' for Plaintiff's management to commit scientific misconduct is a matter of opinion that cannot be proven true or false."); *see also 61 Crown Street, LLC v. Kingston Uptown Business Men's Ass'n, Inc*., 2020 WL 6047832, at \*7 (Sup. Ct. N.Y. Cty. Oct. 13, 2020) ("the accusations…characterize plaintiffs' motivations, and thus, are not capable of being proven true or false and thus constitute opinion.").[10]

In sum, when reviewed in context, these challenged statements are protected opinions that are supported in the Book by an array of facts that Taibbi does not dispute. On that basis, the Complaint must be dismissed with prejudice.[11]

---

[10] Higgins's word choices such as "cash in" and "windfall," are also nonactionable because they are "attempt[s] to ascribe a measure of significance" to Taibbi's conduct, *i.e.*, "loose, figurative" language incapable of being proven true or false. *See Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265, at \*7 (E.D.N.Y. Oct. 25, 2019) (finding that "What is major to one is minor to another; it is a term that adds relativity, and therefore uncertainty, to the meaning" of a statement, indicating it may be a statement of opinion), *aff'd*, 815 F. App'x 618 (2d Cir. 2020) (summary order).

[11] Beyond the snippets from the Book identified in the Complaint, Plaintiff also identifies plainly manufactured statements. The Book does not state anywhere that "Plaintiff ignored the story that 'the Trump administration routinely demanded material be taken down' by Twitter" or any other story. Compl. ¶ 23. Instead, it questions Taibbi's choice to focus *first* on the Hunter Biden story. *See* Book at 185-186 ("he chose to publish the Hunter Biden story first, focusing on right-wing red meat that agitated the base but didn't provide much in the way of news."). Nor does the Book ever state, as the Complaint contends, that Taibbi's "income 'exploded' during the Twitter Files project". Compl. ¶ 15. Instead, the Book states that "[Taibbi's] *Substack had exploded* after the Twitter Files reporting," Book at 195-96 (emphasis added). As stated above, these statements are opinions based on undisputed facts and nonactionable.

## II.    PLAINTIFF FAILED TO ALLEGE ACTUAL MALICE

As set forth in *Sullivan* and its progeny, to demonstrate "actual malice," Plaintiff must show that Defendants published the alleged defamatory statements with knowledge that they were false or with a reckless disregard of whether they were false or not.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 285-86 (1964); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666–67 (1989).  "Actual malice" is a subjective standard that is measured at the time of publication by "what the defendant actually believed and not by 'whether a reasonably prudent man would have published or would have investigated before publishing.'"  *Goldblatt v. Seaman*, 225 A.D.2d 585, 586 (2d Dep't 1996) ("Therefore, the key consideration is whether Defendants "*in fact* entertained serious doubts as to the truth of his publication.") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)); *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 179 (S.D.N.Y. 2024) ("The inquiry is a subjective one, focusing upon the state of mind of the publisher of the allegedly libelous statements at the time of publication.") (internal quotation marks and citation omitted). Thus, unlike other fault standards, even an "extreme departure" from responsible journalism does not rise to the level of actual malice. *Harte-Hanks*, 491 U.S. at 665.  Put simply, "[t]here must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731 (emphasis added).

"Not only is proving actual malice a heavy burden, but, in the era of *Iqbal* and *Twombly,* pleading actual malice is a more onerous task as well."  *Biro*, 963 F. Supp. 2d at 278 (internal quotes and citations omitted). "Pleading 'actual malice buzz-words' is simply not enough to nudge a case into discovery."  *Id.* at 279–80 (citation omitted). And, for this reason, courts routinely dismiss defamation claims prior to discovery based on the failure to adequately plead actual malice.  *See Cabello-Rondon*, 720 F. App'x. at 88; *Biro*, 807 F.3d at 542; *MiMedx Grp.*, *Inc. v.*

*Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at \*9–11 (S.D.N.Y. Sept. 29, 2018); *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 573 (S.D.N.Y. 2014). This result is mandated because a plaintiff must plead actual malice with clear and convincing facts. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 773,  (1986) (Actual malice must be shown with "'convincing clarity' or, in a later formulation, by 'clear and convincing proof'"). Taibbi has failed to plead actual malice, and for this independent reason the Complaint must be dismissed with prejudice.

Attempting to meet his burden, Plaintiff first repeats the actual malice standard, alleging that "Defendants published these statements knowing or recklessly disregarding their falsity." Compl. ¶ 25. But "allegations that defendants 'acted with actual malice' and 'knew or should have known the [article] was false' are merely conclusory, and therefore must be discarded at the outset." *Biro,* 963 F. Supp. 2d at 281. Next, he alleges that Higgins's statements during the Book's press tour are evidence of his actual malice. Compl. ¶¶ 21, 30-33. Finally, he alleges, without a factual basis, that "Defendant Hachette failed to fact-check the Book" and "Higgins had not interviewed Plaintiff or consulted available evidence." *Id.* at ¶¶ 25, 34. None of these claims holds up under scrutiny and, even if true, do not support actual malice.

First, the Book is clear that Higgins made several attempts to interview Taibbi for his book, just as he asked Glenn Greenwald. Unlike Greenwald, however, Taibbi refused to be interviewed. Book at 197 ("When reached via email for comment, Taibbi initially responded with two words: 'Lol. Pass.'"); *id.* at 238 ("When I followed up to see if he'd change his mind on talking with me for this book, he replied…").  Having had a chance to comment on the Book's reporting, Taibbi cannot now claim that publishing without his interview is actual malice. *See InkMango, Inc. v. Warren*, 84 Misc. 3d 1227(A), at \*4 (Sup. Ct. N.Y. Cty. 2024), *aff'd,* 243 A.D.3d 476 (1st Dep't 2025) (plaintiff failed to allege actual malice where evidence showed defendant had "reached out

to [plaintiff] multiple times for an interview" and plaintiff declined).

Despite Plaintiff's refusal to cooperate, the Book on its face establishes that it is grounded on hundreds of sources, as documented in the pages of footnotes and internal references, and includes countless statements in Plaintiff's own words from his published writing, prior interviews, congressional testimony, and social media posts, that together shape and inform the Book's arguments and conclusions. *See, e.g.,* Book at 196, 198, 201-202, 205; *Cabello-Rondon*, 2017 WL 3531551, at *10 (when "the authors sought comment [from plaintiff] before publication, and the article included, in several places, earlier statements by [plaintiff]…disputing any allegations of wrongdoing and contesting factual claims by at least one of the sources quoted in the article,' plaintiff cannot establish actual malice"); *Biro*, 963 F. Supp. 2d at 280-81 (no actual malice when the defendant relied on a source publication that had a reputation "for being an assiduous and thorough fact-checker"); *Fodor v. Berglas*, 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995) (no actual malice when the defendant relied on a reputable source publication and, therefore, would have no reason to believe the statement was inaccurate). Such thorough reporting and reliance on scores of sources and documents refute a suggestion of actual malice. *Satanic Temple, Inc. v. Newsweek Mag. LLC*, 774 F. Supp. 3d 688, 705 (S.D.N.Y. 2025) (no actual malice where "the record evidence clearly demonstrates that [reporter] spoke with multiple other individuals, conducted her own research, including reviewing articles, books, and internet sources, and interviewed other individuals, including non-anonymous sources, which all supported her decision to include the Article Statement."), *appeal filed,* 25-868 (2d Cir. Apr. 11, 2025).  Notably, Taibbi does not allege that the countless sources referenced in the Book were unreliable, "rending implausible any suggestion" of actual malice. *Cabello-Rondon*, 2017 WL 3531551, at *10 ("portions of the article that Cabello does not challenge as false render implausible any suggestion

of 'purposeful avoidance.'").

Second, Plaintiff's reliance on Higgins's post-publication interviews is not a sufficient basis for an actual malice finding, because actual malice is evaluated from the time of publication. *See Bobulinski*, 758 F. Supp. 3d at 179. But, even if they were considered, a simple review of the incorporated interviews reveals that Plaintiff's characterizations are inaccurate. At no point does Higgins "admit" that the thesis of the Book is unfounded. Indeed, it is just the opposite. For example, Plaintiff alleges Higgins's appearance on a podcast called *Keen on America* illustrates his actual malice:

> When podcaster Andrew Keen said on February 7, 2025 on the *Keen on America* podcast, "You are alleging there is a deal" and asked Higgins to explain it, Higgins said that in Plaintiff's case, it was not a deal but an "implicit understanding," in which a source wouldn't have to tell a reporter, "Hey we need you to spin this in this way" because "they would just know," as in "you do this and you get benefit."

Compl. ¶¶ 21, 30-31. But, in context, this is anything but a confession. Despite Keen's provocations, Higgins clarifies that he is not alleging an explicit deal or corrupt transaction— precisely the same conclusions he states in the Book. When Keen nonetheless pushed for an example, "Higgins repeatedly decline[d] to offer any example of financial corruption on Plaintiff's part." *Id.* at ¶¶ 30-31. Plaintiff alleges this is proof of actual malice, but Higgins makes these statements because they are true: the Book does not assert any financial corruption. Indeed, Higgins points to Taibbi's own theories for further explanation:

> You know in Matt's *Hate Inc*, which is his book on the media…. He writes about how… the Department of Defense, or you know, another national security agency, would leak certain documents to certain reporters, and they wouldn't have to like run down the exact reasons why they were leaking that to them. They wouldn't have to tell them, hey, we need you to spin this in this way. They would just know. They just knew that they were the ones that were going to do that. There was, it was an implicit understanding. Like you do this and you get a benefit. I don't think that is a difficult thing to understand. So, when the same thing happens with these guys… when Matt is cherry-picked, you know, like handpicked to do the Twitter

Files, I think that the same thing applies."

Compl. ¶ 30, n.7 (*Keen On America*, Episode 2330: Eoin Higgins on how reactionary tech billionaires bought Glenn Greenwald and Matt Taibbi, 19:33-21:01, *available at* https://podcasts.apple.com/gb/podcast/episode-2330-eoin-higgins-on-how-reactionary-tech-billionaires/id1448694012?i=1000690030129).    The remaining post-publication interviews similarly do nothing more than provide evidence of Higgins's firm belief in the accuracy of what he reported in the Book.  The Book never asserts that Taibbi was paid directly by Musk to report the Twitter Files or that he was otherwise financially corrupted. As documented above, the Book's argument is far more nuanced with numerous factors leading to Taibbi's rightward shift, such as age, personal politics and public acclaim.[12]

Finally, Plaintiff does not allege any facts about Hachette that could meet the heavy burden of actual malice. While he boldly alleges that the Book was not fact-checked—an allegation that is completely unsubstantiated and belied by the pages and pages of footnotes citing Higgins's sources—publishers are "entitled as a matter of law" to rely on an author's "reputation[] and experience," *McManus v. Doubleday & Co*., 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981), and are "not obligated to check every single fact in the Book." *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 227 (S.D.N.Y. 1993) (even under less burdensome gross irresponsibility standard); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382–83 (1977) (granting summary judgment for publisher where it "placed its reliance upon [the author's] reportorial abilities"); *Fodor*, 1995 WL

---

[12] The interviews cited by Plaintiff over and over show that Higgins simply restates the very arguments set forth in the Book. In the Vanguard podcast, for example, Higgins states "I don't really know if they are being pushed to go to the right because of this, or if they're kind of shift to the right on a lot of these issues is based in their actual politics. But, ultimately, I wonder if it really matters. I mean like I argue in the book, it's not just a one to one. It's not that once Matt Taibbi got, you know, selected by Elon Musk for the Twitter Files that he kind of like went to the right, he was already on the right before that. Why had he gone to the right? Well, there are a lot of different factors that explain it. Part of his audience, part of it's like the nuance of, like, getting older and having different politics and different experiences that change the way that you think about things." *See* Compl. ¶ 31 n.7 at 39:26.

505522, at *5; *Wright v. Belafonte*, 2014 WL 13111397, at *10 (S.D.N.Y. Mar. 11, 2014), (allegations that defendant "failed an industry standard" by "failing to fact-check" is "conclusory, and therefore need not be assumed to be true for the purposes of a motion to dismiss under Rule 12(b)(6)"), *report and recommendation adopted*, 2014 WL 1302632 (S.D.N.Y. Mar. 31, 2014), *aff'd,* 687 F. App'x 1 (2d Cir. 2017); *Weber v. Multimedia Ent., Inc*., 2000 WL 526726, at *11 (S.D.N.Y. May 2, 2000) ("Unless there is a reason to doubt an author's credibility, the publisher is under no obligation to investigate."). Hachette's reasonable reliance on Higgins's reporting and "sterling reputation for accuracy," *Masson*, 960 F.2d at 902, negates any claim of actual malice as a matter of law.

Plaintiff's failure to allege actual malice is yet another independent basis requiring the Complaint to be dismissed with prejudice.

## CONCLUSION

Defendants respectfully request that the Court grant their motion to dismiss, dismissing Plaintiff's complaint with prejudice, and for such other relief as it deems just and proper.

Dated: January 20, 2026            **DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*

Elizabeth A. McNamara
Leena M. Charlton
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        leenacharlton@dwt.com

*Attorneys for Defendants Eoin Higgins
and Hachette Book Group, Inc.*