**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATT TAIBBI,                                                      Civil Action No:  1:25-cv-9511 (GBD)

               Plaintiff,

           v.                                          **AMENDED COMPLAINT**

EOIN HIGGINS and BOLD TYPE BOOKS,

 a division of  HACHETTE BOOK GROUP, INC.

              Defendants.

### NATURE OF THE ACTION

1.  This is an action for defamation *per se* arising from the February 4, 2025, publication of "Owned: How Tech Billionaires on the Right Bought the Loudest Voices on the Left" ("Owned" or the "Book"), authored by Defendant Eoin Higgins ("Higgins") and published by Defendant Bold Type Books, a division of Hachette Book Group, Inc. ("BTB").

2.  The Book falsely portrays Plaintiff Matthew Taibbi, an award-winning journalist, as having "cashed in" with Elon Musk ("Musk"), sold out his professional ethics, and concealed stories for partisan gain.

3.  The Book's cover illustration (Fig. 1 below) depicts a puppeteer's strings, suggesting the "Loudest Voices on the Left," primarily Plaintiff and fellow award-winning journalist Glenn Greenwald, are puppets to billionaires.



(Front Cover fig 1.)

4. These allegations amongst others littered throughout Owned are provably false and defamatory *per se*, because they accuse Plaintiff of dishonesty, corruption, and unethical conduct in his chosen profession.

5. Defendants acted with actual malice. *Inter alia* Higgins admitted in a contemporaneous interview that the subtitle's premise, that wealthy tech billionaires "bought" Plaintiff and others, was unsupported: "If people are expecting that they're going to be a little disappointed because you can't really track decisions like this 100 percent to one thing alone." (Washington Babylon, Feb. 2025).

6. When pressed by other journalists to substantiate his claims, Higgins was completely unable to provide basic foundation for his allegations to a level that satisfied his peers.

## PARTIES

7. Plaintiff Matt Taibbi is a journalist, author, and resident and citizen of Morris County, New Jersey.

8. Defendant Eoin Higgins is a journalist and author, believed to reside in and is a citizen of Windham, Maine.

9. Defendant Bold Type Books is an imprint of Hachette Book Group, Inc., headquartered at 1290 Avenue of the Americas, New York, NY 10104.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because Bold Type Books is based here and the publication was distributed here.

**FACTUAL ALLEGATIONS**

12. Plaintiff has built a career on independent journalism and now relies exclusively on reader subscriptions through Substack since leaving Rolling Stone. He has won numerous awards for ethics and reporting excellence, including the National Magazine Award, the I.F. Stone award for Independent Journalism, the Samizdat Prize, and the Integrity Media award.

13. Journalism is a trust business and Plaintiff has built a long and successful career based on a reputation for honesty, ethics, and independent judgment. *Owned* asserts on the cover that Plaintiff is "bought" and "owned" by "tech billionaires on the right," asserts that he received a "cash in" (p.9) and earned a "windfall" (p.186) through his association with Tesla and X CEO Elon Musk and asserts that he sold his "credibility." The facts are exactly the opposite, which he would know if Higgins conducted minimal research.

14. Plaintiff has never accepted money, employment, or inducements from Elon Musk ("Musk") or any other conservative billionaire patron.

15. In fact, Mr. Taibbi twice refused Musk's offers to monetize content directly on Twitter (now known as X), citing ethical concerns, which has had deleterious effects.

   **A.  The Book and Its Marketing Materials**

16.  The Book was marketed and published with integrated cover materials, including a front cover (fig. 1), back cover text, (fig. 2)  spine (fig 4.) and jacket flaps (figs. 3 and 5) , all of which were designed to be read by prospective purchasers and reviewers prior

to purchase and independent of the Book's internal chapters. These materials constitute a single integrated publication for purposes of defamation.



(Back Cover fig. 2)

$30.00 US / $40.00 CAN

*Owned* is the story of the underreported and growing collusion between new wealth and new journalism. In recent years, right-wing billionaires like Elon Musk, Peter Thiel, Marc Andreessen, and David Sacks have turned to media as their next investment and source of influence. Their cronies are Glenn Greenwald and Matt Taibbi—once known as idealistic and left-leaning voices, now beneficiaries of Silicon Valley largesse. Together, this new alliance aims to exploit the failings of traditional journalism and undermine the very idea of an independent and fact-based fourth estate.

*Owned* examines how this shift has allowed spectacularly wealthy reactionaries to pursue their ultimate goal of censoring critics so to further their own business interests—and personal vendettas—entirely unimpeded while also advancing a toxic and antidemocratic ideology.

A rich history of the decades-long rise of this new right-wing alternative media takeover, *Owned* follows the money, names names, and offers a chilling portrait of a future social media and news landscape. It is a biting exposé of journalistic greed, tech-billionaire ambition, and a lament for a disappearing free press.

EOIN HIGGINS

OWNED

HOW TECH BILLIONAIRES ON THE RIGHT BOUGHT THE LOUDEST VOICES ON THE LEFT

BOLD TYPE BOOKS



© MOLLY HALEY

# EOIN HIGGINS

is a journalist and historian. His work has appeared in many top progressive and mainstream publications, including the *Washington Post*, the *Intercept*, *Appeal*, *New Republic*, *Nation*, *Fairness and Accuracy in Reporting (FAIR)*, and many others. He lives in New England.

BOLD TYPE BOOKS

JACKET DESIGN BY PETE GARCEAU
JACKET IMAGE © ISSARAWAT TATTONG VIA GETTY IMAGES
**Bold Type Books**

(Left Flap fig. 3)          (Spine fig. 4)          (Right Flap fig. 5)

## B. Defamatory Statements on the Book's Jacket Flaps and Back Cover

17. On Back Cover, Defendants expressly identify Plaintiff Matt Taibbi as being one of the main subjects of *Owned*.

18. The Defendants also state that Plaintiff is under the "snug patronage of billionaires."

19. The Back Cover further represents that *Owned* "follows the money, names names" and that it is and that it is "a biting exposé of journalistic greed."

20. On the Left Flap, the Defendants expressly state that right-wing technology billionaires have turned to media as "their next investment and source of influence," and that **"**their cronies are Glenn Greenwald and Matt Taibbi.**"**

21. These statements identify Plaintiff Matt Taibbi by name and assert as fact that he is a *crony* of wealthy technology figures; that his journalism is directly paid for by them; and that his reporting is devoid of independent journalistic judgment.

22. In ordinary usage, the term "crony" denotes a person who receives favor, benefit, or advantage through a close and improper relationship, often involving money or power.

23. "Patronage" likewise refers to the provision of financial support, sponsorship, economic backing, or material benefit by a wealthy or powerful actor to a professional, artist, or institution.

24. Likewise, an assertion that a work "follows the money" and "names names" represents to readers that the author has traced actual financial relationships and identified specific recipients of improper payments or patronage.

25. Describing the Book as an "exposé of journalistic greed" asserts professional dishonesty and unethical conduct.

26. These assertions are false. Plaintiff has never been a "crony" of Elon Musk or any other technology billionaire, has never received patronage, sponsorship, employment, or

financial inducement from such individuals, and has never altered or shaped his journalism in exchange for financial benefit.

27. Even where individual phrases are framed rhetorically, Defendants' Front Cover, Spine, Back Cover, flaps, and interior statements operate together to convey the false and defamatory implication that Plaintiff abandoned professional independence, concealed material facts, and aligned his journalism with the interests of billionaire patrons having been paid by them to do so.

**C.  The Book's Cover and Flaps Falsely Represent That the Book Conducts an Investigative Tracing of Financial Corruption**

28. Defendants repeatedly and prominently represent, on the Book's Front Cover, flaps and Back Cover, that *Owned* "follows the money," "names names," and constitutes "a biting exposé of journalistic greed" where journalists were "bought." These statements communicate to ordinary readers that the Book contains investigative findings identifying specific financial transactions or payments received by Plaintiff from wealthy technology figures.

29. In fact, the Book contains no evidence whatsoever that Plaintiff received payments, sponsorship, or financial inducement from Elon Musk or any other billionaire. The Book does not identify any financial transfers, contracts, compensation arrangements, or quid pro quo of any kind involving Plaintiff.

30. The disparity between Defendants' marketing claims and the Book's actual contents is stark. While Defendants present the Book as investigative journalism that traces

money and exposes corruption, the Book offers only speculation, inference, rhetorical insinuation, and narrative framing untethered to documentary or financial proof.

31. By falsely presenting the Book as an exposé that "follows the money," Defendants cloaked unsupported accusations in the aura of investigative reporting, thereby encouraging readers to accept defamatory conclusions about Plaintiff's integrity and motives despite the absence of evidence.

32. Defendants knew, or recklessly disregarded, that no such evidentiary investigation existed. Nonetheless, they deliberately marketed the Book as an exposé of financial corruption, thereby amplifying the defamatory sting of accusations that Plaintiff was a "bought" "crony," who operated under "patronage," and acted out of "journalistic greed."

33. This misleading presentation is material. Reasonable readers are entitled to rely on representations that a work purports to "follow the money" and "name names." When no such evidence is provided, the resulting accusations of corruption are not protected opinion, but false statements and implications of fact published with reckless disregard for the truth.

34. At p.71 Higgins states "Reporters like Greenwald (and as we will see later, Matt Taibbi) fit into that world, researcher and author Becca Lewis told me, by attaching themselves to these powerful men who have more than just cash to offer …" In context, and in a work marketed as an exposé that "follows the money" and exposes "journalistic greed," this statement asserts and implies that Plaintiff aligned himself with powerful individuals to obtain improper financial or non-financial benefits,

thereby compromising his journalistic independence and ethics. That implication is false. Plaintiff did not attach himself to any individual for improper gain, did not receive cash or other inducements, and did not alter his reporting to curry favor with any powerful person.

35. *Owned* at p.134 states that "[b]oth men were able to bring their established audiences over to the newsletter site and directly benefit from its subscription model," a fact that flatly contradicts any claim that Plaintiff was "owned" or "bought." Earning income from voluntary, reader-funded subscriptions evidence independence, not patronage or control, and portraying such success as corruption falsely impugns Plaintiff's professional integrity.

36. Defendant Higgins himself publishes his work on Substack, including through a paid newsletter at https://eoinhiggins.substack.com/. Defendants' portrayal of Plaintiff's use of Substack as evidence of corruption, patronage, or loss of independence is therefore untenable, as the same platform is treated by Defendant Higgins as a legitimate vehicle for independent journalism.

37. Throughout the Book, Higgins repeats this false theme, including claims that Taibbi received "cash in" (p. 9) from Musk, or laundered anything (p.9), and goes as far to state at p. 186 "[h]is Twitter account blew up, and his Substack— already incredibly successful— gained thousands of subscriptions. The reporting generated a financial windfall for the writer, even if its findings were dismissed by more sober commentators."

38. In actuality, 86.3% of Plaintiff's Substack site's growth came in the three and a half years before the Twitter Files, while just 13.7% has come in the three-plus years since this alleged "windfall" and very little came during the publication window.

39. The "thousands" of new subscribers that *Owned* claims Plaintiff gained after publication of the Twitter Files represented only a small percentage of Plaintiff's overall readership. Defendants omit that during the second and third months of the project, Plaintiff experienced 4,844 subscriber cancellations and a $20,644 loss in revenue, as readers became frustrated that Plaintiff was publishing his work on another platform.

40. Plaintiff's income did not "explode" during the Twitter Files project as alleged at p. 196. To the contrary, during two months of peak public interest in the project, Plaintiff lost money for the first time in his career as an independent journalist while he published his work for free on Twitter.

41. Subsequently, after Musk restricted Substack links for reasons unrelated to this matter, Plaintiff's subscription growth slowed even more, leading to a net financial loss.

42. Most importantly, however, the book in its entirety is an assertion of dishonesty and poor ethics when the Twitter Files episode was a textbook demonstration of journalistic ethics. Like several other Twitter Files reporters, Plaintiff was offered a direct inducement by Musk, who asked him to move to his new "Twitter Subs" platform, where "you will get far more subscribers." Plaintiff refused, citing

journalistic ethics, in a conversation that was made public and which Defendant Higgins clearly read as evidenced by his selective quotation.

43. "If I did that," Plaintiff wrote to Musk, talking about a potential move to Twitter, "people would say I'm essentially an employee of Twitter and both of us would never hear the end of it," adding, "the optics would be really bad, journalistic ethics-wise." To which Musk immediately replied, "Then I guess it's goodbye." That is Plaintiff directly refusing to be "bought."

44. Inside Substack, Plaintiff's decision to refuse Musk's offer was received with relief. As a spokesperson for Substack put it, "Matt was being pressured by Elon to stop publishing on Substack and instead publish exclusively on Twitter...We appreciated Matt standing his ground by not submitting to Elon's demands."

45. There is a crucial moment in *Owned* where Higgins claims that "finally," only the "threat to Taibbi's bottom line" at p. 196 that motivated Plaintiff to stand up to Musk. This again is the exact opposite of what happened. In reality Plaintiff was offered a more lucrative bottom line by Musk, refused it, and was immediately  kicked off the Twitter Files project, his X following was frozen and deamplified. To have this episode described as unethical and unprincipled is outrageous. Defendants take a moment when Plaintiff refused money and stood up to a billionaire and turn this into a book about kowtowing to one and selling out to them.

46. Higgins falsely claims Plaintiff "fully dispensed with any pretense of challenging power in 2022," a year in which he actually investigated, wrote and published damaging stories about the FBI, CIA, and Department of Homeland Security.

47. Later, Plaintiff was visited by the IRS during Congressional testimony about these reports.

48. Defendant Higgins maintains that he approached Plaintiff about the allegations in *Owned* at p. 197 but in so doing, indulges in author's legerdemain, The email Defendant Higgins cites as having "sought comment" from Plaintiff did not request comment on the Book's central accusation that Plaintiff was "owned," "bought," operating under "patronage," or motivated by "journalistic greed." The actual email chain reads as follows:

> On Saturday, March 16, 2024 at 02:16:51 PM EDT, eoin higgins <eoinhiggins@gmail.com> wrote:
> Hi Matt,
> I wanted to follow up here and see if anything has changed on your end—would really like to chat about the above as well as the Twitter Files reporting and aftermath/reaction from liberal and conservative media types.
> If there's any chance you've changed your mind and we can jump on a call in the next few days, please let me know.
> Best,
> E
> On Fri, Feb 2, 2024 at 5:40 PM eoin higgins <eoinhiggins@gmail.com> wrote:
> > Thanks for the quick response, if you change your mind please let me know.
> >
> > Have a great weekend.
> >
> > On Fri, Feb 2, 2024 at 5:39 PM Matthew Taibbi wrote:
> >> Lol. Pass.
> >> Sent from my iPhone
> >>> On Feb 2, 2024, at 5:20 PM, eoin higgins <eoinhiggins@gmail.com> wrote:
> >>>
> >>> Hello Matt,
> >>> My name is Eoin Higgins, I'm a writer working on a book-length project about, among other things, the way some media personalities

change their audiences from the left to the right, and the reasons for that switch.

>>> Your journey from a liberal audience to a more conservative audience is part of the story. I've spoken to a number of your former colleagues as well as others in the media about your shift; I've also been going over some of your more recent media appearances and House Committee hearings.

>>> I'd love the opportunity to interview you about how your audience changed and, more broadly, how you see the left/right political landscape today.

>>> The latter half of this month would be best for my schedule. Do you have availability between February 18 and 25?

>>> Thanks so much for your time and I eagerly await your reply.

>>> Best,

>>> E

>>> --

>>> Eoin Higgins

>>> @EoinHiggins_

>>> @eoinhigginswriting

49. Instead, the email described a proposed conversation about Plaintiff's "audience change," media reactions to the Twitter Files, and the left-right political landscape. At no point did Defendant Higgins disclose that the Book would accuse Plaintiff of financial corruption or patronage, nor did he offer Plaintiff a meaningful opportunity to respond to those allegations. An invitation to discuss political audience dynamics is not a request for comment on an accusation of corruption, and Defendants cannot rely on this exchange to claim good-faith inquiry into the truth of their defamatory premise.

50. While there is nothing unethical about changing attitudes, which Plaintiff disputes he has done, the Book continually claims that only a dishonest person under the sway of "tech billionaires" could, say, oppose cancel culture or think universities are for

learning instead of indoctrination, or that the Russiagate story was a riddled with errors.

**D. Defendants Published the Accusations Pursuant to a Preconceived Narrative, Not an Investigation**

51. In the Book's acknowledgments at p. 249, Higgins admits that he was approached by Bold Type to write the Book, stating: *"When I was approached by Bold Type to write this book, I knew I needed my agent on board."* This admission confirms that the Book originated as a commissioned project, not as the result of an independent investigation uncovering previously unknown facts.

52. The Book's title, subtitle, and central thesis—that certain journalists were "owned," "bought," and motivated by "journalistic greed" were established before any purported investigation into Plaintiff's conduct or finances. The narrative of corruption thus preceded any evidentiary inquiry.

53. Rather than following evidence to conclusions, Defendants worked backward from a predetermined thesis, employing speculation, insinuation, and ideological disagreement to support accusations of financial corruption without identifying any payments, patronage, or quid pro quo involving Plaintiff.

54. Publishing accusations of professional corruption pursuant to a preconceived narrative, while conceding the absence of proof that Plaintiff was "bought", constitutes reckless disregard for the truth.

55. Defendants nonetheless marketed the Book as an exposé that "follows the money" and "names names," thereby representing to readers that factual findings existed

when Defendants knew, or recklessly disregarded, that no such evidence supported the accusations against Plaintiff.

56. In media appearances about *Owned,* Higgins on occasion had to defend the central thesis of corruption. When podcaster Andrew Keen said on February 7, 2025 on the *Keen on America* podcast, "You are alleging there is a deal" and asked Higgins to explain it, Higgins said that in Plaintiff's case, it was not a deal but an "implicit understanding," in which a source wouldn't have to tell a reporter, "Hey we need you to spin this in this way" because "they would just know," as in "you do this and you get benefit."

57. That this is what Higgins offers as proof of the concrete corruption implied by the cover is staggering in its brazen admission for a lack of journalistic standards and disregard for Plaintiff's reputation.

58. As an example of the Book's determination to find unethical behavior where there is none, at p. 185 Defendant Higgins claims Plaintiff ignored the story that "the Trump administration routinely demanded material be taken down" by Twitter. Plaintiff in fact *broke* that story, in the first Twitter Files report on December 2, 2022.

59. Higgins additionally compared Plaintiff to fellow Twitter Files reporter Bari Weiss, saying at p. 185 "[u]nlike Taibbi, [Bari] Weiss used Musk rather than being used by him and spun the Twitter Files into an independent career move." In fact, Weiss immediately parlayed the Twitter Files into a fundraising campaign that generated $15 million in seed capital for her Substack platform *The Free Press*, money which came from actual billionaires Marc Andreessen and David Sacks, then later sold the

property for $200 million to another billionaire, Larry Ellison. Plaintiff meanwhile never sought outside funding and never solicited help of any kind from wealthy donors, in direct contradiction to the Book's claims.

60. Defendants published these statements knowing or recklessly disregarding their falsity and knowing that Higgins had not interviewed Plaintiff or consulted available evidence.

61. Defendants published the Front Cover, Back-Cover, Spine and flaps statements knowing that they lacked evidence that Plaintiff received money, patronage, or financial benefit from any billionaire, or with reckless disregard for that fact.

62. Higgins has admitted contemporaneously that readers expecting proof of who was "bought" would be disappointed, yet Defendants nonetheless marketed the Book as an exposé that "follows the money," "names names," and exposes "journalistic greed."

63. The Book treats lawful, disclosed, audience-driven professional success as presumptively corrupt unless it conforms to the author's ideological expectations, and then retrofits that ideological disapproval into accusations of financial wrongdoing without evidence.

64. Basic disregard for elementary fact is replete throughout the Book. For instance, Higgins writes that Plaintiff early in his career "largely went after GOP politicians, and hardly seemed a threat to Democrats or the left," despite the fact that Plaintiff wrote one best-selling book, *Spanking The Donkey,* that was entirely devoted to mocking

Democrats and another, *The Divide,* whose reporting focused on the failure of the Justice Department of Barack Obama to prosecute corrupt banks.

65. Following publication, Higgins admitted in *The Plot to Steal the Media: Send in the Clowns* published on February 4, 2025, that the Book's central thesis was unsupported, stating in an interview that readers "expecting" a direct line (i.e. proof) would "be disappointed."

66. These falsehoods constitute defamation per se, as they directly accuse Plaintiff of professional corruption, dishonesty, and unethical conduct.

67. Higgins continues to promote the idea the Plaintiff is "bought" and "owned" in high-profile media appearances in outlets like *The Chicago Tribune,*[1] *The Nation*,[2] *The American Prospect,*[3] *CSPAN,*[4] *The New Republic,*[5] *Salon.com*[6]*,* and other broadcast and podcast appearances, in order to promote himself and the Book.

68. On February 7, 2005, Podcaster Andrew Keen[7] repeatedly pressed Higgins, noting "the subtitle of your book is 'How Tech billionaires on the right have bought the loudest voices on the left" and cautions that "this is quite a serious allegation."

69. When asked to provide his best "Smoking gun" evidence of such corruption. Higgins repeatedly declined to offer any example of financial corruption on Plaintiff's part,

---

[1] https://www.chicagotribune.com/2025/04/26/biblioracle-eoin-higgins-owned/
[2] https://www.thenation.com/podcast/society/ttom-07212025/
[3] https://prospect.org/podcasts/2025-02-13-owned-higgins-greenwald-taibbi/
[4] https://www.c-span.org/program/book-tv/owned-how-tech-billionaires-on-the-right-bought-the-loudest-voices-on-the-left/656023
[5] https://newrepublic.com/article/193531/glenn-greenwald-matt-taibbi-tech-billionaires-journalists
[6] https://www.salon.com/2025/02/02/the-substack-invasion-when-the-tech-bros-came-for-journalism-everything-changed/
[7] https://www.youtube.com/watch?v=Vsn3LxIe-ZU

and ultimately replied, "I think that the investment in Rumble and paying Glenn [Greenwald] to come to Rumble is a pretty good smoking gun for paying these journalists." No connection whatsoever to Plaintiff.

70. On *The Vanguard* podcast on April 27, 2025[8]  Higgins conceded that his journalistic method was deeply lacking, admitting that  "It's not like Matt Taibbi get selected by Elon Musk to do the Twitter Files and then went to the right," but that the perceived ideological change was based on a "lot of factors," that "part of it is like the nuance of getting older and having different politics and different experiences that change the way you think." Hardly the stuff of being 'owned.'

71. On his own admission, having trampled on Mr. Taibbi's reputation to gain currency and elevate himself, Higgins concedes that his calumny was bogus, unsubstantiated and *ipso facto,* malicious.

72. Bizarrely, Defendant Hachette failed to fact-check the Book and demonstrated reckless disregard to the truth of the allegations contained therein.

73. Accusations that a journalist is a "crony" of powerful financiers, that his work is motivated by "greed," and that an exposé "follows the money" to him accuse Plaintiff of professional corruption and dishonesty, striking at the core of his profession and constituting defamation *per se*.

74. Plaintiff's father was a journalist; he grew up surrounded by journalists and takes journalistic ethics very seriously. Plaintiff has never burned a source, broken a confidence, massaged a quote, or colored outside factual lines.

---

[8] https://www.youtube.com/watch?v=jm1k9IWwCyY

75. When Plaintiff makes mistakes, he admits it and it is precisely because he is not "owned" or "bought" that he need he demands his reputation remain intact — as an independent journalist who does not rely on donor and any suggestion of dishonesty is professionally ruinous.

## CLAIM FOR RELIEF

### COUNT I – Defamation Per Se (Against All Defendants)

76. Defendants published false and defamatory statements of fact about Plaintiff in the Book.

77. Defendants' Front Cover, Spine, Back Cover and flaps statements are independent defamatory publications. They do not merely summarize the Book's contents but affirmatively assert new factual accusations of financial corruption and professional misconduct concerning Plaintiff.

78. These statements are defamatory *per se* because they accuse Plaintiff of corruption, dishonesty, and unethical conduct in his profession.

79. Defendants acted with actual malice or with reckless disregard for the truth.

80. Plaintiff has suffered reputational and financial damages in an amount to be determined at trial but in excess of $1,000,000.

## JURY DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and award:

    i.     Compensatory damages;

    ii.    Punitive damages;

    iii.   Costs and attorneys' fees; and

    iv.   Such other relief as the Court deems just and proper.

Dated:       February 3, 2025
               Washington, DC

Respectfully submitted,

**GS2LAW PLLC**

By: _____

Robert Garson (RG 1521)
20801 Biscayne Blvd, Suite 506
Aventura, FL, 33180
rg@gs2law.com
*Attorneys for Plaintiff, Matt Taibbi*