**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATT TAIBBI,

                         Plaintiff,

            v.

EOIN HIGGINS and BOLD TYPE BOOKS, a
division of HACHETTE BOOK GROUP, INC.,

                         Defendants.

Case No. 1:25-cv-09511-GBD

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION**
**TO DISMISS PLAINTIFF MATT TAIBBI'S AMENDED COMPLAINT**

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Leena Charlton
1251 Avenue of the Americas, 42ND Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
             leenacharlton@dwt.com

*Counsel for Defendants*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 3

    A.    Parties........................................................................................................................ 3

    B.    The Book.................................................................................................................. 3

    C.    Matt Taibbi's Career ............................................................................................... 4

    D.    The Twitter Files .................................................................................................... 5

    E.    The Complaint and Challenged Statements ........................................................... 7

STANDARD OF REVIEW ........................................................................................................... 7

ARGUMENT ................................................................................................................................. 8

I.      THE CHALLENGED STATEMENTS ARE NONACTIONABLE OPINION ................. 9

    A.    Statements On The Book's Cover, Like Its Contents, Are Protected Opinion ..... 11

    B.    The Remaining Challenged Statements are Non-Actionable Opinion ................. 16

II.    PLAINTIFF FAILED TO ALLEGE ACTUAL MALICE ............................................... 20

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*61 Crown Street, LLC v. Kingston Uptown Bus. Men's Ass'n, Inc.*,
2020 WL 6047832 (Sup. Ct., N.Y. Cnty. Oct. 13, 2020) ........................................................16

*1st Amend. Praetorian v. N.Y. Times Co.*,
2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ...........................................................................24

*Adelson v. Harris*,
973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd,* 876 F.3d 413 (2d Cir. 2017) ..............................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................7, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................20

*Biro v. Conde Nast ("Biro I")*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012)...............................................................................10, 21

*Biro v. Conde Nast ("Biro II")*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd,* 807 F.3d 541 (2d Cir.), *aff'd,* 622 F. App'x 67
(2d Cir. 2015)..........................................................................................................8, 20, 22

*Blouin v. Conde Nast*,
No. 25 CIV. 5425 (GBD), 2026 WL 276119 (S.D.N.Y. Feb. 3, 2026)...................................19

*Bobulinski v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024)..............................................................................20, 22

*Bordoni v. N.Y. Times Co.*,
400 F. Supp. 1223 (S.D.N.Y. 1975)..................................................................................18, 19

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) .................................................................................................................9

*Buckley v. Vidal*,
327 F. Supp. 1051, 1052 (S.D.N.Y. 1971)................................................................................2

*Cabello-Rondon v. Dow Jones & Co.*,
2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d. Cir. 2018)
.................................................................................................................................10, 21, 22

*Caraway v. L.S. Agency*,
1986 WL 12529 (S.D.N.Y. Oct. 27, 1986) .............................................................................12

ii

*Cassava Scis., Inc. v. Heilbut*,
  2024 WL 553806 (S.D.N.Y. Jan. 5, 2024), *report and recommendation adopted sub nom.*
  *Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ....................14, 16

*Chau v. Lewis*,
  771 F.3d 118 (2d Cir. 2014)...........................................................................................8, 9, 13

*Dunlop-McCullen v. Rogers*,
  2002 WL 1205029 (S.D.N.Y. Feb. 21, 2002).........................................................................24

*Fodor v. Berglas*,
  1995 WL 505522 (S.D.N.Y. Aug. 24, 1995)..........................................................................22

*Galland v. Johnston*,
  2015 WL 1290775 (S.D.N.Y. Mar. 19, 2015) ........................................................................10

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)..................................................................................................................9

*Goldblatt v. Seaman*,
  225 A.D.2d 585 (2d Dep't 1996)............................................................................................20

*Graham v. UMG Recordings, Inc.*,
  2025 WL 2879607 (S.D.N.Y. Oct. 9, 2025), *appeal filed* (2d Cir. Oct. 30, 2025) ...........11, 13

*Greene v. Health & Hosps. Corp. of City of N.Y.*,
  1995 WL 661111 (Sup. Ct., N.Y. Cnty. Mar. 23, 1995) ........................................................15

*Gross v. N.Y. Times Co.*,
  82 N.Y.2d 146 (1993) ..........................................................................................................9, 10

*Hall v. Binghamton Press Co.*,
  263 A.D. 403 (N.Y. App. Div. 1942), *aff'd*, 296 N.Y. 714 (1946) .........................................14

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)...........................................................................................................20, 24

*Herbert v. Lando*,
  603 F. Supp. 983 (S.D.N.Y. 1985) ...........................................................................................7

*InkMango, Inc. v. Warren*,
  84 Misc. 3d 1227(A), (Sup. Ct., N.Y. Cnty. 2024), *aff'd,* 243 A.D.3d 476 (1st Dep't 2025).21

*Jacob v. Lorenz*,
  626 F. Supp. 3d 672 (S.D.N.Y. 2022)......................................................................................17

*Jewell v. NYP Holdings, Inc.*,
  23 F. Supp. 2d 348 (S.D.N.Y. 1998)........................................................................................10

*Kalimantano GmbH v. Motion in Time, Inc.*,
  939 F. Supp. 2d 392 (S.D.N.Y. 2013)..........................................................................................8

*Kerik v. Tacopina*,
  64 F. Supp. 3d 542 (S.D.N.Y. 2014)...........................................................................................21

*Kesner v. Dow Jones & Co., Inc.*,
  515 F. Supp. 3d 149 (S.D.N.Y. 2021).................................................................................. *passim*

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006)........................................................................................................8

*Lynch v. City of N.Y.*,
  952 F.3d 67 (2d Cir. 2020)..........................................................................................................7

*Madison v. Frazier*,
  539 F.3d 646 (7th Cir. 2008) ....................................................................................................15

*Masson v. New Yorker Mag., Inc.*,
  501 U.S. 496 (1991), *remanded*, 960 F.2d 896 (9th Cir. 1992).........................................20, 25

*McDougal v. Fox News Network, LLC*,
  489 F. Supp. 3d 174 (S.D.N.Y. 2020).......................................................................................24

*McGlothlin v. Hennelly*,
  370 F. Supp. 3d 603 (D.S.C. 2019)...........................................................................................14

*McManus v. Doubleday & Co.*,
  513 F. Supp. 1383 (S.D.N.Y. 1981)..........................................................................................25

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990)......................................................................................................................10

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
  2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)..........................................................................21

*Montgomery v. Risen*,
  197 F. Supp. 3d 219 (D.D.C. 2016), *aff'd,* 875 F.3d 709 (D.C. Cir. 2017)...........................14

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254, 279-80 (1964) ....................................................................................................20

*Naantaanbuu v. Abernathy*,
  816 F. Supp. 218 (S.D.N.Y. 1993) ...........................................................................................25

*Obi v. Amoa*,
  58 Misc. 3d 446 (Sup. Ct., Kings Cnty. 2017)..........................................................................17

iv

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ................................................................................................21

*Rapaport v. Barstool Sports, Inc.*,
    2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021), *aff'd,* 2024 WL 88636 (2d Cir. Jan. 9, 2024)
    ................................................................................................................................16

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (1977) ..............................................................................................25

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
    774 F. Supp. 3d 688 (S.D.N.Y. 2025), *appeal filed* (2d Cir. Apr. 11, 2025) .........................22

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ...........................................................................................20, 25

*St. Louis v. NYP Holdings, Inc.*,
    2017 WL 887255 (Sup. Ct., N.Y. Cnty. Feb. 6, 2017) ............................................11

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010) .......................................................................................7

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986) ..............................................................................................10

*Suozzi v. Parente*,
    202 A.D.2d 94 (1st Dep't 1994) ..............................................................................15

*Test Masters Educ. Servs. v. NYP Holdings, Inc.*,
    603 F. Supp. 2d 584 (S.D.N.Y. 2009) ................................................................10, 11

*Thomas v. Westchester Cnty. Health Care Corp.*,
    232 F. Supp. 2d 273 (S.D.N.Y. 2002) ........................................................................8

*Weber v. Multimedia Ent., Inc.*,
    2000 WL 526726 (S.D.N.Y. May 2, 2000) ..............................................................25

*Wexler v. Dorsey & Whitney, LLP*,
    2019 WL 5485265 (E.D.N.Y. Oct. 25, 2019), *aff'd*, 815 F. App'x 618 (2d Cir. 2020) ..........19

*White v. Berkshire-Hathaway, Inc.*,
    10 Misc. 3d 254 (Sup. Ct., Erie Cnty. 2005) ..........................................................11

*Wright v. Belafonte*,
    2014 WL 13111397 (S.D.N.Y. Mar. 11, 2014), *report and recommendation adopted*, 2014
    WL 1302632 (S.D.N.Y. Mar. 31, 2014), *aff'd*, 687 F. App'x 1 (2d Cir. 2017). ......................25

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)..................................................................................................................1

Fed. R. Evid. 201(b).....................................................................................................................3

Defendants Eoin Higgins and Bold Type, an imprint of Basic Books Group, a division of Hachette Book Group, Inc. ("Hachette")[1] (collectively, "Defendants") respectfully submit this memorandum of law in support of their Rule 12(b)(6) motion to dismiss Plaintiff Matt Taibbi's amended complaint with prejudice.

## PRELIMINARY STATEMENT

In February 2025, Hachette published "*OWNED: How Tech Billionaires On The Right Bought The Loudest Voices On The Left*" by Defendant Eoin Higgins (the "Book" or "*Owned*"), which explores tech billionaire influence in the media industry—particularly Elon Musk's purchase of Twitter and Marc Andreesen's investments in Substack—and the curious phenomenon of former leftwing journalists, Glenn Greenwald and Matt Taibbi, aligning with these rightwing billionaires. Relying on a wealth of documentation and interviews, including with other journalists and academics, the Book details the intersections between the journalists and the billionaires. Ultimately, with regard to Plaintiff, Higgins concludes that factors like age, personal politics, Gen X ethos, and scandal led to Taibbi affiliating with the Right and aligning himself with Musk. Financial benefits, the Book makes clear, were at most a byproduct of his choices. Taibbi brings this defamation *per se* claim based on the Book's cover, jacket, and random words or phrases pulled from the Book. Yet, even after amendment, the Complaint still does not state a claim.

*First*, Taibbi alleges that the Book's jacket "asserts…that Plaintiff is 'bought' and 'owned' by [or a 'crony' of] 'tech billionaires on the right,'" suggests that he is a "puppet[] to billionaires" who engages in "journalistic greed," and is actionable on its own. Am. Compl. ("Compl.") ¶¶ 3, 13, 21, 28, 77. But titles must be considered in context. Here, the jacket addresses one of the Book's central questions: how Taibbi, once a darling of the Left, found success on the Right.

---

[1] The case caption incorrectly identifies Bold Type and Hachette's corporate affiliation.

Disagreement with Higgins's political conclusions cannot support a viable claim.

*Second*, Taibbi claims the Book accuses him of "dishonesty, corruption, and unethical conduct," but only cites to decontextualized words or phrases, while failing to challenge the facts underlying Higgins's conclusions. *Id.* ¶¶ 4, 13. For example, Taibbi alleges that Defendants' falsely concluded that he received a "windfall" after he published the Twitter Files—an important inflection point in his career—but he *admits* that he gained "thousands" of paid subscribers to his Substack. *Id.* ¶¶ 37-39. Whether that represented a small or large percentage of his total subscribers, "windfall" is a purely subjective term. Over and over, the Complaint's strained effort to cherry-pick phrases—taking them out of context or, worse, misrepresenting the language—does not state a claim and only underscores that the Book's opinions are fully protected.

*Finally*, despite amending his complaint, Plaintiff fails to plead actual malice, independently requiring dismissal. He does not allege a single fact to support that either Defendant knew a challenged statement was false or had any doubt about its accuracy, let alone facts that meet the "clear and convincing" standard. And he now admits that Higgins asked to interview him, but he dismissively declined ("Lol. Pass"). *Id.* ¶ 48-49. Instead, Plaintiff baldly alleges that the Book was written with a "preconceived narrative" and was not fact-checked and that Higgins "conced[ed] the absence of proof" in his post-publication press tour. *Id.* ¶ 54. Each allegation is contradicted by the Book itself or the Complaint. Even if true, none meets the high burden of pleading actual malice.

At bottom, Plaintiff takes issue with the Book's central conclusions but not its facts. Some 50 years ago, another upset writer (whose career also rested on First Amendment protections) used the courts to try to suppress the speech of his political opposite. In *Buckley v. Vidal*, Vidal's attempt to silence Buckley failed, with the court observing that "[w]hen an author submits his work to the

public he must, of necessity, expect criticism of that work…no matter how hostile such criticism may be." 327 F. Supp. 1051, 1052 (S.D.N.Y. 1971) (commentary describing Vidal's book as a "pornographic potboiler done for money"). To quote Matt Taibbi, "To small thinkers, free speech is a wilderness of potential threats. Thankfully, America wasn't founded by small thinkers."[2] It is because of this free speech ethos that his Complaint must be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    Parties

Plaintiff Matt Taibbi is an "award-winning" journalist and author, well-known for his reporting on the Twitter Files. Compl. ¶ 2. Defendant Eoin Higgins is a historian, journalist, and author of *Owned. Id.* ¶¶ 1, 8. Defendant Hachette published *Owned* in February 2025. *Id.* ¶ 1.

### B.    The Book

The Book provides a roadmap of its central themes. From the outset, it engages with "an alternative history of the last quarter century from the point of view of the left that…struggled with defections and conversions under Trump and Biden." Book at 11. This story begins with the "rise of the new tech companies" and "Silicon Valley elites"—particularly billionaires Andreessen, Musk, and Peter Thiel—who eventually "worked to 'disrupt' the media space to their own benefit." *Id.* at 10-11. To that end, they created a new "media ecosystem," demonstrated by Musk's purchase of Twitter. *Id.* at 9-10. The Book describes how they "forged an informal alliance" with formerly leftwing journalists, like Glenn Greenwald and Plaintiff, who effectively chose "personal preservation over cause" and ceased criticizing the billionaires. *Id.* at 12-13. "Ultimately, *Owned* is a meditation on the question of power," and is not so much "concerned with asking why they

---

[2] Matt Taibbi, "How to Fight Back Against the Censors," THE FREE PRESS (Oct. 1, 2024), https://perma.cc/QR99-T4Q6 (last visited Feb. 13, 2026). The Court may take judicial notice of Taibbi's published writings, as they are "not subject to reasonable dispute." Fed. R. Evid. 201(b).

made that choice. Its purpose is to point out how the rest of us can avoid being bought." *Id.*

### C.    Matt Taibbi's Career

The Book meticulously details Taibbi's career trajectory and shifting alliances, using sources such as Taibbi's own writing, public statements, interviews, and sworn testimony, as well as published articles and commentary about him, and Higgins's own conversations with reporters and academics, which are identified in the extensive footnotes. *Id.* at 251-280. To be thorough, as Plaintiff now admits, Higgins repeatedly sought to interview Taibbi, who declined. Compl. ¶¶ 48-49; *see* Book at 197, 238. Despite his refusal, the Book is still peppered with Taibbi's publicly available responses to various critiques. *See id.* at 124-25, 129, 136-37, 198-202.

As Higgins documents, Taibbi began his writing career in post-Soviet Russia. *Id.* at 117-119, 121. When Taibbi returned to the U.S., he worked for *Rolling Stone*, "primarily target[ing] the big banks and the excesses of Wall Street" during the 2007-2008 financial crisis. *Id.* at 122-23. There, Taibbi catapulted to fame with his description of Goldman Sachs as "a great vampire squid wrapped around the face of humanity, relentlessly jamming its blood funnel into anything that smells like money." *Id.* Clearly, Taibbi once understood the power of a vivid metaphor.

Later, at *Rolling Stone*, Taibbi covered the Trump campaign and Russiagate. *Id.* at 125-26. But "[b]y rejecting Russiagate, Taibbi was accused by liberals of taking the side of Trump and the Kremlin." *Id.* at 127. Though he attempted a "soft reboot with his liberal audience" with a book on Eric Garner and Black Lives Matter, his press tour was tainted when "scandal hit as his old misogynistic writings [from *The eXile*] resurfaced." *Id.* The Book states the specific claims were disproved, with one woman calling them "ridiculous." *Id.* at 129. But, his left-leaning audience kept dwindling and, Higgins argues, "Taibbi turned to a new right-wing audience" and "became increasingly beholden to their priorities." *Id.; see also id.* at 9. Yet, the Book also acknowledges,

"Taibbi may have never had firm ideological commitments, at least not to the left." *Id.* at 130.

In 2020, Taibbi decamped to Substack—a subscription-based platform, funded in part by Marc Andreesen, who had begun to shape Substack into a rightwing haven. *Id.* at 10, 132-34, 145. By 2023, Substack was platforming openly neo-Nazi content. *Id.* at 136. When asked about this troubling content, "Matt Taibbi took aim [at the reporter, Katz], calling him a 'tireless busybody.'" *Id.* at 137. At Substack, he found "huge success" and has "made millions from his self-published work on the site," which he still does not deny. *Id.* at 134.[3] Indeed, upon amendment, he now admits that "the 'thousands' of new subscribers…gained after publication of the Twitter Files represented only a small percentage of Plaintiff's overall readership." Compl. ¶¶ 38-39.

### D.    The Twitter Files

In 2022, Musk bought Twitter, which quickly became a "venue for right-wing speech," and he promised to expose the "rot at [its] core…particularly to his critics on the left and his friends on the right." *Id.* at 179, 181. To that end, Musk sought reporters to review Twitter's internal documents, and billionaire David Sacks suggested Taibbi. *Id.* at 182. Taibbi accepted the task, which he admits came with "certain conditions," including publishing first on Twitter.[4] Book at 197. With great fanfare, he released the "Twitter Files" in December 2022. *Id.* at 182. The Book argues that this conditional alignment with Musk was when Taibbi "fully dispensed with any pretense of challenging power." *Id*.

"The Twitter Files, Part One" covered only "How and Why Twitter Blocked the Hunter

---

[3] Substack's paid subscription data is not publicly available, but sources estimate Taibbi's Substack—currently ranked #11 in politics—brings in between $500,000 and $5,000,000 per year. *See* Bron Maher, *Revealed: Top 27 highest-earning Substack newsletters generate over $22m a year,* PRESSGAZETTE (Feb. 9, 2023), https://perma.cc/37GF-6KU6 (last visited Feb. 13, 2026); SUBSTACK, *Bestsellers in U.S. Politics,* https://perma.cc/H94T-9LBU (last visited Feb. 13, 2026); Ross Barkan, *Taibbi Agonistes*, POLITICAL CURRENTS BY ROSS BARKAN (Dec. 8, 2022), https://perma.cc/8DBZ-VLEL (last visited Feb. 13, 2026).

[4] Taibbi, *Note to Readers*, RACKET NEWS (Dec. 2, 2022), https://perma.cc/2Z5L-ZUAG (last visited Feb. 13, 2026).

Biden Laptop Story."[5] Higgins asserts that, at most, the story "showed a flawed but exhaustive effort on the part of Twitter executives to manage the fallout and attempt to make the right determination." *Id.* at 183. And "Taibbi later admitted there was no evidence of government involvement in the laptop story decision." *Id.* (quoting Taibbi's own tweets). Nonetheless, "right-wing actors supported the reporting, lending Taibbi their platforms and hyping the story." *Id.* at 185. The Book does not suggest that Musk paid Taibbi, but notes that Taibbi's "Twitter account blew up, and his Substack—already incredibly successful—gained thousands of subscriptions," *id.* at 186, which Taibbi does not dispute. *See* Compl. ¶¶ 37-39.

At the same time, noting the reliance on Musk's "cherry-picked documents," "[c]ritics charged that Taibbi and Musk, by working together, had actually deployed a coordinated leak rather than a neutral release of information." Book at 183, 186. Or, as a commentator observed, Taibbi was "volunteering to do online PR work for the world's richest man on a Friday night, in service of nakedly and cynically right-wing narratives." *Id.* at 183-84. Indeed, during the Twitter Files and the growing criticism of Musk's free speech principles, Taibbi, in his own words, "repeatedly declined to criticize" Musk. *Id.* at 195 n.1 (citing April 10, 2023 messages from Taibbi to Musk). Instead, he publicly celebrated Musk for "spen[ding] $44 billion" to become a "whistleblower" of his own company. *See id.* at 196 (citing Joe Rogan Experience, Episode 1940 at 4:50 to 5:48). But, the Book makes clear, Taibbi bristled at any suggestion that he was being "spoon-fed" information from Musk and called it "ridiculous" that he was going easy on Twitter. *Id.* at 198-202.

Subsequently, Taibbi was a "star witness[]" at Republican-led congressional hearings on the Twitter Files. As the Book argues, "Taibbi's alliance with House GOP members…shows that

---

[5] Taibbi (@mtaibbi), X (Dec. 2, 2022, at 07:06 PM ET), https://x.com/mtaibbi/status/1598830911776251906.

the desire for attention and material benefit tempers any sense of challenging power." *Id.* at 205.

### E.    The Complaint and Challenged Statements

On February 3, 2026, Plaintiff filed his Amended Complaint asserting one count of defamation *per se* against Defendants based on selective phrases or art from the Book's cover and jacket copy that allegedly accuse Plaintiff of "financial corruption and professional misconduct." Compl. ¶ 77-78. Beyond the cover, Plaintiff alleges various cherry-picked words or phrases—such as "cash in," "windfall," or "laundered"—are false and defamatory. *Id.* ¶¶ 13, 37. That is it.[6]

Plaintiff alleges that Defendants acted with actual malice because 1) Higgins had a "preconceived narrative" when writing the Book, 2) did not sufficiently seek comment from Taibbi, and 3) "admitted" in post-publication interviews that the Book's "central thesis" was "unsupported," and 4) Hachette "failed to fact-check the Book." *Id.* ¶¶ 48-50, 54, 65, 72. Plaintiff alleges damages in excess of $1,000,000. *Id*. ¶ 80.

### STANDARD OF REVIEW

To survive a motion to dismiss, plaintiffs must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court must "accept all 'well-pleaded factual allegations' in the complaint as true." *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020). "'[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' however, dismissal is appropriate." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (citing *Iqbal,* 556

---

[6] "[A] defamation plaintiff does not satisfy the requirements of notice pleading unless he specifically alleges the words said to be actionable." *Herbert v. Lando*, 603 F. Supp. 983, 990 (S.D.N.Y. 1985) (citing cases). In addition to taking statements out of context, Plaintiff implies there are more unidentified statements. Compl. ¶ 4 ("These allegations amongst others littered throughout *Owned*"). Such unidentified statements are not the subject of this litigation.

U.S. at 1950). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006). "[T]he Court may consider documents…incorporated by reference, documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citations omitted). Here, of course, the Book is incorporated into, and central to, Plaintiff's Complaint.

"Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013) (citation omitted), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

## ARGUMENT

In New York, a plaintiff must allege: "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability."[7] *Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014). As a public figure, Plaintiff must allege that each defendant acted with actual malice. *See Biro v. Conde Nast ("Biro II")*, 963 F. Supp. 2d 255, 269, 276 (S.D.N.Y. 2013), *aff'd,* 807 F.3d 541 (2d Cir.), *aff'd,* 622 F. App'x 67 (2d Cir. 2015). This Complaint must be dismissed with prejudice because: 1) the cover is a fair index of the Book's content, 2) all challenged statements are nonactionable opinions based on disclosed facts, and 3) Plaintiff failed to allege clear and convincing evidence of actual malice.

---

[7] Statements are defamatory *per se* if they "charg[e] an individual with a serious crime" or "tend[] to injure another in his or her trade, business, or profession." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 419 (S.D.N.Y. 2013) (citations omitted).

## I.    THE CHALLENGED STATEMENTS ARE NONACTIONABLE OPINION

The Complaint rests primarily on a strained reading of the Book's cover image and jacket copy as accusations of Taibbi *literally* being "owned" and "bought" by billionaires and engaging in "dishonesty, corruption, and unethical conduct." Compl. ¶¶ 4, 66. To support this unfounded contention, Taibbi plucks a few words from a 247-page book and its jacket, but fails to address their context or to deny their factual underpinnings—as he must. While he clearly dislikes Higgins's conclusions, they are fully protected opinions.

Opinions are protected because, as the Supreme Court held, "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). "Whether a challenged statement is an opinion is a question of law," and actions are routinely dismissed up front when opinions, not facts, are challenged. *See*, *e.g.*, *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 170 (S.D.N.Y. 2021) (dismissing on 12(b)(6) motion); *Chau*, 771 F.3d at 128 ("only factual statements are actionable"). The court must look at the content of the entire communication, its tone and apparent purpose, to determine whether a reasonable person would consider it as conveying facts about the plaintiff. *See Brian v. Richardson,* 87 N.Y.2d 46, 51 (1995).

New York "has embraced a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more protective of the cherished constitutional guarantee of free speech [than the Federal standard]." *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152 (1993). That test considers:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal… readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Id.* at 152-53 (citation omitted). "A 'pure opinion' is a statement of opinion which is accompanied by a recitation of the facts upon which it is based." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). "[T]his class of statements" is fully protected, as it provides "the full context of the communication 'signal[ing] readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Gross*, 82 N.Y.2d at 154 (citation omitted). The law is clear that a defamation claim will not survive dismissal when a plaintiff does not dispute the facts upon which a challenged opinion is based. *See Cabello-Rondon v. Dow Jones & Co.*, 2017 WL 3531551, at \*5-6 (S.D.N.Y. Aug. 16, 2017) (no claim where "plaintiff appears to seek every possible route around the essential fact that he does not claim that defendant's statements were false" (cleaned up)), *aff'd*, 720 F. App'x 87 (2d. Cir. 2018); *Galland v. Johnston*, 2015 WL 1290775, at \*6 (S.D.N.Y. Mar. 19, 2015) (dismissing claim where plaintiff did not dispute fact upon which opinion was premised); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998) (same).

Courts also "afford[] constitutional protection to the type of speech often characterized as 'rhetorical hyperbole,' 'parody,' 'loose,' or 'figurative.'" *Biro v. Conde Nast ("Biro I")*, 883 F. Supp. 2d 441, 460-61 (S.D.N.Y. 2012) (citation omitted). This principle "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' [that] has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990) (citation omitted).

Central to any defamation claim—and in particular an opinion analysis—is the consideration of the challenged language in its "full context." *Gross,* 82 N.Y.2d at 152-53. A headline or cover is not independently actionable so long as it is a "'fair index' of the 'substantially accurate' material included" in the book. *Test Masters Educ. Servs. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) (citation omitted). Under this standard, Defendants "need not

choose the most delicate words available in constructing its headline," *id.* at 589, even if it is "unfortunate, sensationalist and drafted simply to garner attention." *St. Louis v. NYP Holdings, Inc.*, 2017 WL 887255, at *1-2 (Sup. Ct., N.Y. Cnty. Feb. 6, 2017) ("Drunk driving-pothead thinks he's fit to be a corrections officer" non-actionable as article made clear marijuana charges were dropped); *Test Masters,* 603 F. Supp. 2d at 589 ("SCAM" was fair index of article explaining the government investigated and demanded that the company provide refunds). "This threshold question is one of law for the court, not a question of fact for a jury." *White v. Berkshire-Hathaway, Inc.*, 10 Misc. 3d 254, 255 (Sup. Ct., Erie Cnty. 2005).

Every statement at issue is constitutionally protected opinion, supported by disclosed facts and reflecting Higgins's characterization of, or speculation about, Taibbi's career. As such, the Complaint fails to state a legal claim.

### A.    Statements On The Book's Cover, Like Its Contents, Are Protected Opinion

Plaintiff alleges the illustration and the phrases "bought," "owned," "crony," "snug patronage of billionaires," and "exposé of journalistic greed," on the Book's jacket are defamatory. Compl. ¶¶ 17-19, 25, 32, 35. However, in context, the entire cover fairly indexes the Book's central thesis, which is itself protected opinion. *Graham v. UMG Recordings, Inc.*, 2025 WL 2879607, at *11 (S.D.N.Y. Oct. 9, 2025) ("The Image is designed to reinforce the message of the Recording" and is "protected opinion"), *appeal filed*, (2d Cir. Oct. 30, 2025).

To begin, despite acknowledging that "owned" and "bought" are part and parcel of the "Book's title, subtitle, and central thesis," Compl. ¶ 52, Plaintiff oddly asserts that the Book's cover and jacket copy "constitute a single integrated publication," *Id.* ¶ 16, separate and apart from the Book itself. This ignores both law and common sense. Like an article's headline or an album's cover art, the primary purpose of a book's cover is to distill the essence of a work and attract a reader's attention. *See Graham,* 2025 WL 2879607, at *11 (album cover art "shares the same

11

overall context as the Recording itself"); *Caraway v. L.S. Agency*, 1986 WL 12529, at *6 (S.D.N.Y. Oct. 27, 1986) (it is the court's "duty to view the cover objectively and not to 'pick out and isolate particular phrases'" (citation omitted)). Indeed, here, the cover explicitly invites that "[a]nyone who wants to understand the media landscape of the twenty-first century needs to read this book." Compl. ¶ 16. Thus, a cover—including the image, description, blurbs, and reviewer comments— necessarily capsulizes and highlights the Book's central themes and subjects. Metaphor, hyperbole, symbolism, and colorful imagery are to be expected.

Here, the jacket copy of *Owned*—including reviewer commentary—reflects the work as a whole. From its opening pages, the Book clearly outlines its political argument on the societal consequences of billionaires co-opting platforms of public discourse to give voice to their personal views. *Id.* ¶ 3. It explores how journalists can fall sway to public acclaim and the benefits resulting from alliances with these billionaires. Like any good political exegesis, the Book considers many moving pieces and engages with opposing arguments and perspectives. Higgins meticulously plots these factors to explain Taibbi's ideological shift. For example, Higgins speculates that a dwindling liberal audience was a practical reason, *i.e.*, he went where he was welcome. Book at 9-10, 126-30. He proffers that "Taibbi's politics, steadily more shaped by his identity as an older white man, are running into a brick wall of preferred pronouns, more thoughtful sexual politics, and racial awareness." *Id.* at 131, *id.* at 240 ("It's also about getting older, having your politics change."), *id.* at 201, 245-46. He also acknowledges Taibbi "may have never had firm ideological commitments, at least not to the left." *Id.* at 117; *see also id.* at 126-27, 130-31.

The Book is *not* depicting a sinister enterprise, but something far more nuanced. It explicitly argues that the battle waged by tech billionaires to "control[] the new media" was not won with illegal payments or the literal "buying" of journalists, but instead by providing a "path

to professional preservation" that allowed journalists like Greenwald and Taibbi to move to the Right along with their audiences and embrace the adulation and fame that followed. Book at 4-5.

In short, the jacket pithily conveys this message. The illustration of "puppeteer's strings" does not convey facts, similar to *Graham*, but winks at these underlying themes. 2025 WL 2879607, at *11 ("An image of a caged owl cannot reasonably be understood to convey a factual message."). "Owned" describes the media landscape as it is falls further under the control of billionaires, and "bought" describes Taibbi's position within a complicated system that ultimately resulted in his shifting politics—at least according to his critics on the Left.[8] They are simply attention-grabbing metaphors or "rhetorical hyperbole" to reflect Higgins's broader arguments.

This conclusion does not change with the Complaint's addition of phrases from the Book's jacket—describing Greenwald and Taibbi as "**cronies**," their journey from "alternative journalism into the **snug patronage** of billionaires," and the Book as a "**biting exposé of journalistic greed**, tech-billionaire ambition, and a lament for a disappearing free press." Compl. ¶16. Plaintiff does not dispute or even contend with the underlying facts or critiques that inform these views. *See Kesner*, 515 F. Supp. 3d at 179 ("Kesner does not dispute these facts. Drawing on them, Buhl opined that they 'could signal' an SEC charge of [sic] or settlement with Kesner."). Taibbi does not dispute—nor could he—that, as the Book documents, his work helped him "compete for limited eyeballs and dollars on monetized platforms," Book at 242, or that his rightward shift coincided with the tech billionaires' increased influence over media. He certainly cannot deny that this shift was noticed by billionaires, like Elon Musk, who handpicked him to report out the Twitter Files with "certain conditions." Nor does he deny that his reporting mirrored Musk's public

---

[8] Plaintiff fails to establish that each of the phrases from the cover—such as "names names" and "follows the money," Compl. ¶ 19—are specific to Taibbi, who is only one of the Book's many subjects. *See Chau*, 771 F.3d at 129 (statements must be "of and concerning" the plaintiff).

sentiments about Democratic and leftwing corruption, increasing Taibbi's public profile and providing additional attention. *Id.* at 196, 199; Compl. ¶ 38. Indeed, Taibbi does not challenge, as the Book documents, that his "cozy relationship" with Musk and his Twitter Files reporting were roundly criticized as "online PR work," a "controlled infodump," or "carrying water for a billionaire." Book at 183, 185, 198, 201. Finally, he, of course, admits that his relationship with Musk resulted in his self-censorship. Book at 195 n.1 ("I've repeatedly declined to criticize you").

In this context, the jacket's hyperbolic comments are prototypical protected opinions. As stated above, Higgins is not referring to criminal activity, clandestine payments, or bribes, but to the benefits Taibbi experienced because of his highly conditional relationship to these billionaires, specifically to Musk. *Cassava Scis., Inc. v. Heilbut*, 2024 WL 553806, at *5 (S.D.N.Y. Jan. 5, 2024), *report and recommendation adopted sub nom. Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ("cronies" is non-actionable opinion); *McGlothlin v. Hennelly,* 370 F. Supp. 3d 603, 618 (D.S.C. 2019) ("crony capitalist" or "crook" are protected rhetorical hyperbole); *Montgomery v. Risen,* 197 F. Supp. 3d 219, 248 (D.D.C. 2016), *aff'd,* 875 F.3d 709 (D.C. Cir. 2017) (being motivated out of greed or ambition is a subjective judgment that is not verifiable); *Hall v. Binghamton Press Co.,* 263 A.D. 403, 412 (N.Y. App. Div. 1942), *aff'd*, 296 N.Y. 714 (1946) ("greed" comes in many forms including "greed for office, praise, popularity, fame or other baubles").

Plaintiff's attempt to show that the challenged statements mean "his journalism is directly paid for by [billionaires]," Compl. ¶¶ 21-25, runs headfirst into the actual reporting in the Book, which makes clear that financial incentives were not the driving force behind the journalist's actions. Book at 71; *id.* at 126-28 ("Taibbi wasn't the only liberal victim of the right wing's weaponization of Me Too to settle scores…."), *id.* at 240 ("It's also about getting older…."); *id.*

at 201, 245-46. Tellingly, even his Complaint acknowledges that "[r]eporters like Greenwald (and as we will see later, Matt Taibbi) fit into that world…by attaching themselves to these powerful men who have *more than just cash to offer—they have social and cultural capital*." Compl. ¶ 34. "[A]t most, [the Book] suggests that plaintiff took advantage of his [] connections to gain some [] benefit." *Suozzi v. Parente,* 202 A.D.2d 94, 100-01 (1st Dep't 1994). But "[i]n the absence of some clear assertion of criminality such an accusation is not defamatory and does not constitute libel per se." *Id.* (citation omitted); *see also Greene v. Health & Hosps. Corp. of City of N.Y.*, 1995 WL 661111, at *3 (Sup. Ct., N.Y. Cnty. Mar. 23, 1995) (refusing to find defamatory meaning where there is no "clear allegation of any criminal conduct").

To be sure, Plaintiff does identify certain facts he *believes* undermine Defendants' conclusions, but those facts do not negate Defendants' opinions or the facts they rely on. For example, Plaintiff alleges that he "has never accepted money, employment, or inducements from Elon Musk or any other conservative billionaire" or "concealed material facts" and that he "refused Musk's offers to monetize content directly on Twitter…citing ethical concerns." Compl. ¶¶ 14-15. But the Book does not make those claims, it simply asserts that he accepted Musk's offer to report out the cherry-picked Twitter Files and benefited from a noticeable increase in Twitter followers and Substack subscribers after the Twitter Files was published, which Plaintiff now admits.

At worst, the reader could conclude that Higgins believes Taibbi "sold out" or chose the path of least resistance. *See id.* ¶ 2 ("The Book falsely portrays Plaintiff…as having 'cashed in' with Elon Musk, sold out his professional ethics..."); Book at 5 ("Rather, they are seen on the left as traitors:  right-wing culture warriors who have sold out to conservative media."). But courts have found such statements are "merely an opinion." *Madison v. Frazier*, 539 F.3d 646, 657 (7th Cir. 2008) ("the phrase 'sell out' is incapable of being verified as a statement of fact"). Even

15

accusations or name-calling, such as "'fraud' (someone who is not the type of person they present themselves to be), a 'hack' (someone who is motivated entirely by money, often at the expense of integrity or professional standards), or a 'wannabe' (someone who aspires vainly to emulate or attain success)," cannot form the basis of a defamation claim as they "suffer from the same defect…they are readily understood as inherently subjective assessments that are incapable of being proven objectively false." *Rapaport v. Barstool Sports, Inc*., 2021 WL 1178240, at \*14 (S.D.N.Y. Mar. 29, 2021), *aff'd,* 2024 WL 88636 (2d Cir. Jan. 9, 2024).

Finally, even if the Book could be reasonably read to convey Taibbi's political shift was largely motivated by money—which contradicts the work's actual language—that speculation would be insufficient to sustain Plaintiff's defamation claim, as commenting on "incentives" are matters of opinion. *Cassava,* 2024 WL 1347362, at \*14 ("whether there exist powerful incentives…to commit scientific misconduct is a matter of opinion"); *see also 61 Crown Street, LLC v. Kingston Uptown Bus. Men's Ass'n, Inc*., 2020 WL 6047832, at \*7 (Sup. Ct., N.Y. Cnty. Oct. 13, 2020) ("the accusations…characterize plaintiffs' motivations, and thus, are not capable of being proven true or false and thus constitute opinion.").

Regardless of the provocative language and imagery, the Book's jacket is not actionable since it is a fair index of its contents and fully protected opinion.

## B.    The Remaining Challenged Statements Are Non-Actionable Opinion

In addition to the Book's cover, Taibbi appears to challenge isolated words or phrases that he claims similarly suggest he was "directly paid" to publish the Twitter Files—*e.g.*, "received a 'cash in,'" "earned a 'windfall,'" his "income…explode[d]'" or that he "fully dispensed with any pretense of challenging power in 2022." *See, e.g.,* Compl. ¶¶ 13, 21, 37, 40, 46.[9] Though the

---

[9] The Complaint also includes manufactured references from the Book. For example, it alleges without any citation that the Book reports that Taibbi "sold his 'credibility,'" is "devoid of independent journalistic judgment," and

Complaint decontextualizes the phrases—often challenging a single word plucked from the Book's pages—they are part of the larger political discourse about the systemic rise of tech billionaires' financial influence in media, using Taibbi's unexpected career trajectory as an example. Book at 9, 13. That context alone signals that the challenged statements are Higgins's opinions, and not statements of inalienable fact. *See Obi v. Amoa*, 58 Misc. 3d 446, 452 (Sup. Ct., Kings Cnty. 2017) ("When the [] statements; read in context, are readily understood as conjecture, hypothesis, or speculation, this signals to the reader that what is said is opinion, and not fact."); Compl. ¶ 30 ("the Book offers only speculation, inference, rhetorical insinuation, and narrative framing," which are not actionable). Further, like the Book jacket statements, these (fractured) statements are grounded in Taibbi's own words and actions, which Plaintiff does not dispute and which undergird Higgins's overarching thesis that Taibbi's career fits neatly into a system that was co-opted by rightwing tech billionaires. *See Kesner*, 515 F. Supp. 3d at 179.

Consider, for example, Taibbi's challenge to the statement that he "dispensed with any pretense of challenging power in 2022." Compl. ¶ 46. The Complaint's quote conveniently excludes the next sentence, which explains that the motivation for his action was specifically "to gain access." Book at 182. This means something entirely different than a quid-pro-quo payment and, in any event, reflects an opinion of Taibbi's Twitter Files reporting. And Taibbi does not dispute any of the underlying facts in the Book supporting this conclusion. *See supra* Sec. I.A.

---

"concealed stories." *e.g.*, Compl. ¶¶ 2, 13, 21, 27, but no such statements appear in the Book. *See also id.* ¶ 58 (Book does not state that "Plaintiff ignored the story that 'the Trump administration routinely demanded material be taken down' by Twitter." Instead, it criticizes the choice to publish the Hunter Biden story first). Plaintiff similarly refers to out-of-context statements allegedly evidencing Defendants "[b]asic disregard for elementary fact" without actually challenging them. *See id.* ¶ 64 ("Plaintiff early in his career 'largely went after GOP politicians, and hardly seemed a threat to Democrats or the left.'"); ¶ 59 ("[U]nlike Taibbi, [Bari] Weiss used Musk rather than being used by him and spun the Twitter Files into an independent career move."). In context, the Book explains these statements with additional facts that Plaintiff again does not dispute. *See* Book at 123, 185, 187. Furthermore, even if they were false, they hardly have a defamatory meaning. *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 689 (S.D.N.Y. 2022)("A plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication.").

Specifically, this challenged statement succinctly describes these facts as an inflection point in Taibbi's transition from an anti-establishment, leftist journalist stridently critiquing the global finance system into a pundit cozying up to Elon Musk and arguing that only the Right fully embraces free speech.

Similarly, phrases like "cash in," "windfall," and "exploded" reflect a pointed perspective on the admitted fact that Taibbi gained thousands of subscribers following the Twitter Files. Higgins uses the phrases "cash in" and "launder" only once in reference to Taibbi. He writes that:

> [T]heir adoption of conservative politics was an attempt to ingratiate themselves with the tech leaders who fund the platforms on which they both now depend to make their money. Both Greenwald and Taibbi were eager to work in the venues that their new funders were promoting. **Taibbi's Twitter Files reporting is a perfect example: he spent decades building up credibility and credentials only to, in one high-profile moment, cash in to launder a CEO's cherry-picked corporate opposition file on his opponents.**

Book at 9-10 (emphasis added); *compare to* Compl. ¶ 37 (alleging the Book "claims that Taibbi *received* 'cash in' *from Musk*, or laundered anything" (emphasis added)). In context, the Book is clearly referring to Taibbi sacrificing his reputation with the Left in order to gain access to the Right—an opinion shared by many, Book at 183, 271 ("volunteering to do online PR work for the world's richest man")—and not referring to any specific financial benefits or transactions, as Plaintiff suggests. *See Bordoni v. N.Y. Times Co.*, 400 F. Supp. 1223, 1228, 1230 (S.D.N.Y. 1975) (declining to "fragmentize and dissect" or "do[] violence to the ordinary and natural meaning of the language" of the work to find a defamatory meaning).[10]

The phrases "windfall" and "exploded" also are taken out of context and are subjective

---

[10] Pointing to private messages published by Musk and Taibbi, Plaintiff likewise argues that his refusal to join Musk at Twitter provides a "textbook demonstration of journalistic ethics." Compl. ¶¶ 42-45. But, there is no dispute that the exchange revealed Taibbi's admission that he "repeatedly declined to criticize" Musk or that Taibbi only *publicly* stood up to Musk after Musk had blocked all links to Substack on Twitter, cutting Taibbi off from his Twitter following. Book at 195.

descriptions of objective facts that Plaintiff now admits. *See* Book at 186 ("His Twitter account blew up, and his Substack—already incredibly successful—gained thousands of subscriptions. The reporting generated a financial **windfall** for the writer, even if its findings were dismissed by more sober commentators."); *Id.* at 196 ("His Substack had **exploded** after the Twitter Files reporting…"). Again, Higgins simply connects two facts of Taibbi's Twitter Files reporting: 1) he very publicly fell in line with Musk, and 2) his influence increased. Rather than disputing these facts, Plaintiff's Complaint now *admits* that his Substack gained "thousands" of additional followers after the Twitter Files and that his livelihood now relies on his Substack subscriptions. Compl. ¶¶ 12, 38-39. Nothing is actionable about the Book's subjective conclusions.[11]

Plaintiff nonetheless spends energy trying to rebut that his "income" did not "explode" after the Twitter Files project, alleging that "during two months of peak public interest in the project, Plaintiff lost money for the first time in his career as an independent journalist while he published his work for free on Twitter." *Id.* ¶¶ 38-40. Even accepting this as true, the Book never speaks to his "income" or any statistical growth in subscribers over three years. And Higgins could not possibly "omit" information not publicly known, like subscriber cancellations, when Taibbi refused to be interviewed. *Id.* ¶ 49. Instead, the Book clearly states "[Taibbi's] *Substack had exploded* after the Twitter Files reporting," Book at 196 (emphasis added), and Plaintiff now admits he gained "thousands" of subscribers. Compl. ¶ 38. The Book's commentary on these undisputed facts are nonactionable subjective opinions. *Wexler v. Dorsey & Whitney, LLP*, 2019

---

[11] The Complaint suggests a defamation by implication claim, but only pleads defamation *per se*. Compl. ¶¶ 76-80; *see Bordoni,* 400 F. Supp. at 1230 (defamation by implication must be affirmatively pleaded). In any event, Taibbi fails to allege that Higgins intended or endorsed the defamatory implication that Musk paid Plaintiff directly or that he was guilty of "financial corruption." *Kesner*, 515 F. Supp. 3d at 170 ("plaintiff must make a rigorous showing that the language of the communication[s] as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference" (citing *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37-38 (1st Dep't 2014)); *Blouin v. Conde Nast*, No. 25 CIV. 5425 (GBD), 2026 WL 276119, at *2-*3 (S.D.N.Y. Feb. 3, 2026) (allegations of "false implications" or that defendant "did not tell the full story" insufficient for defamation *per se*, especially when article contained statements contradicting the alleged implication).

WL 5485265, at *7 (E.D.N.Y. Oct. 25, 2019) ("What is major to one is minor to another; it is a term that adds relativity, and therefore uncertainty, to the meaning" of a statement, indicating it may be a statement of opinion), *aff'd*, 815 F. App'x 618 (2d Cir. 2020) (summary order).

In sum, when reviewed in context, *all* of the challenged statements are protected opinions that are supported in the Book by an array of facts that Taibbi does not dispute, even after amending his Complaint. On that basis, the Complaint must be dismissed with prejudice.

## II.    PLAINTIFF FAILED TO ALLEGE ACTUAL MALICE

As set forth in *N.Y. Times Co. v. Sullivan* and its progeny, to demonstrate "actual malice," Plaintiff must show that Defendants published the challenged statements with knowledge that they were false or with a reckless disregard of their falsity. 376 U.S. 254, 279-80 (1964); *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 511 (1991), *remanded*, 960 F.2d 896 (9th Cir. 1992). It is a subjective standard that is measured at the time of publication by "what the defendant actually believed and not by 'whether a reasonably prudent man would have published, or would have investigated before publishing.'" *Goldblatt v. Seaman*, 225 A.D.2d 585, 586 (2d Dep't 1996) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)); *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 179 (S.D.N.Y. 2024) ("The inquiry is a subjective one, focusing upon the state of mind of the publisher…at the time of publication.") (citation omitted). Thus, even an "extreme departure" from responsible journalism does not rise to the level of actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989). Put simply, "[t]here must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731 (emphasis added).

"[I]n the era of *Iqbal* and *Twombly,* pleading actual malice is a more onerous task." *Biro II*, 963 F. Supp. 2d at 278 (citations omitted). "[P]leading 'actual malice buzzwords' is simply not enough." *Id.* at 279-80 (citation omitted). Rather, it must be pled with clear and convincing facts.

*Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 773 (1986) (actual malice must be shown with "'convincing clarity,' or, in a later formulation, by 'clear and convincing proof'" (citations omitted)). Courts routinely dismiss defamation claims prior to discovery based on the failure to adequately plead actual malice. *See Cabello-Rondon*, 720 F. App'x. at 88; *Biro I*, 807 F.3d at 542; *MiMedx Grp.*, *Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at \*9-11 (S.D.N.Y. Sept. 29, 2018); *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 573 (S.D.N.Y. 2014).

Attempting to meet this burden, Plaintiff alleges that: Higgins 1) "had not interviewed Plaintiff or consulted available evidence," 2) "admitted" publishing with actual malice during his press tour, and 3) published a "preconceived narrative," and that 4) Hachette "failed to fact-check the Book." Compl. ¶¶ 5, 51, 60, 62, 72. These claims are disproven by the Complaint itself and the Book. And, even if true, they cannot support a finding of actual malice. Taibbi's failure to plead actual malice is an independent basis for dismissal with prejudice.

First, the Book is clear—and Plaintiff now admits—that Higgins made several attempts to interview Taibbi, just as he asked Glenn Greenwald. Unlike Greenwald, however, Taibbi refused. *Id.* ¶¶ 48-50; Book at 197 ("When reached via email for comment, Taibbi initially responded with two words: 'Lol. Pass.'"); *id.* at 238. Arguing semantics, Taibbi now alleges that Higgins's request was not a sincere request because it did not provide the specific turns of phrase the Book would ultimately use—owned, bought, patronage, greed. Compl. ¶ 48. But this is irrelevant. The email truthfully stated the Book (and the requested interview) addressed "the way some media personalities change their audiences from left to right, and the reasons for that switch." *Id.* Having had a chance to comment, Taibbi's post hoc preference for more information—which he did not request when he immediately declined the interview—cannot support actual malice. *See InkMango, Inc. v. Warren*, 84 Misc. 3d 1227(A), at \*4 (Sup. Ct., N.Y. Cnty. 2024), *aff'd,* 243

A.D.3d 476 (1st Dep't 2025) (failed to allege actual malice where evidence showed defendant had "reached out to [plaintiff] multiple times for an interview" and plaintiff declined).

Further, despite Plaintiff's refusal to cooperate, the Book is grounded in hundreds of sources and includes countless statements from Plaintiff's own published writing, prior interviews, congressional testimony, and social media posts that together shape and inform the Book's opinions. *See, e.g.,* Book at 196, 198, 201-202, 205; *Cabello-Rondon*, 2017 WL 3531551, at *10 (no actual malice when "the authors sought comment…before publication, and the article included…earlier statements by [plaintiff]…disputing any allegations of wrongdoing and contesting factual claims"); *Fodor v. Berglas*, 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995) (no actual malice when defendant relied on a reputable source publication and would have no reason to believe the statement was inaccurate); *Biro II*, 963 F. Supp. 2d at 280-81 (same). Higgins's thorough reporting refutes any suggestion of actual malice. *See Satanic Temple, Inc. v. Newsweek Mag. LLC*, 774 F. Supp. 3d 688, 705 (S.D.N.Y. 2025) (no actual malice where defendant "spoke with multiple other individuals, conducted her own research, including reviewing articles, books, and internet sources, and interviewed other individuals, including non-anonymous sources"), *appeal filed,* (2d Cir. Apr. 11, 2025). Notably, even in his amended complaint, Taibbi does not allege the Book's sources were unreliable, further "render[ing] implausible any suggestion" of actual malice. *Cabello-Rondon*, 2017 WL 3531551, at *10.

Second, Plaintiff's reliance on Higgins's post-publication interviews cannot support actual malice, which must be evaluated from the time of publication. *See Bobulinski*, 758 F. Supp. 3d at 179. But, even if they were considered, the referenced interviews reveal that Plaintiff's characterizations are inaccurate. At no point does Higgins "admit" that the thesis of the Book is unfounded. Indeed, it is just the opposite. For example, Plaintiff alleges Higgins's appearance on

a podcast called *Keen on America* illustrates his actual malice:

> When podcaster Andrew Keen said…"You are alleging there is a deal" and asked
> Higgins to explain it, Higgins said that in Plaintiff's case, it was not a deal but an
> "implicit understanding," in which a source wouldn't have to tell a reporter, "Hey
> we need you to spin this in this way" because "they would just know," as in "you
> do this and you get benefit."

Compl. ¶¶ 56, 68. In context, this is anything but a confession. Despite Keen's provocations,

Higgins clarifies that he is *not* alleging an explicit deal or corrupt transaction, which precisely

reflects the Book's content. When Keen nonetheless pushed for an example, "Higgins repeatedly

decline[d] to offer any example of financial corruption on Plaintiff's part." *Id.* ¶ 69. Plaintiff

alleges this is proof of actual malice, but Higgins made these statements because they are true: the

Book never asserts that Taibbi was paid directly by Musk to report the Twitter Files or that he was

otherwise "financially corrupt." Plaintiff's allegations to the contrary are based solely on his

strained misinterpretations, not the actual text. In fact, Higgins pointed to Taibbi's own theories

for further explanation of the Book's thesis:

> [I]n Matt's *Hate Inc*, which is his book on the media… he writes about how…the
> Department of Defense or, you know, another national security agency, would leak
> certain documents to certain reporters, and they wouldn't have to, like, run down
> the exact reasons why they were leaking that to them. They wouldn't have to tell
> them, hey, we need you to spin this in this way. They would just know. [I]t was an
> implicit understanding. Like, you do this, and you get a benefit. I don't think that
> is a difficult thing to understand. So…when Matt is cherry-picked, you know, like
> handpicked to do the Twitter Files, I think that the same thing applies.

Compl. ¶ 30, n.7 (KEEN ON AMERICA: *Episode 2330: Eoin Higgins on how reactionary tech

billionaires bought Glenn Greenwald and Matt Taibbi* (Apple, Feb. 7, 2025 at 19:33-21:01),

https://perma.cc/U5RP-ZW5Y). The remaining post-publication interviews only provide more

evidence of Higgins's firm belief in the accuracy of his factual reporting and the related opinions,

which are more nuanced than Plaintiff alleges and consider numerous other factors leading to

Taibbi's rightward shift, such as age, personal politics and public acclaim.[12]

Third, Plaintiff's new allegations that Higgins published with bias or without investigation cannot support actual malice. Despite the abundance of cited source material, Plaintiff alleges that "the Book's title, subtitle, and central thesis…were established before any purported investigation into Plaintiff's conduct or finances," Compl. ¶ 52, and that "[p]ublishing accusations of professional corruption pursuant to a preconceived narrative" constitutes actual malice. *Id.* ¶ 54. Ignoring that Higgins had widely reported on these topics, *id.* ¶ 36, Plaintiff essentially argues that Hachette commissioned the Book and, therefore, it is knowingly false. *Id.* ¶ 51.

In addition to defying common sense and industry practices, this is simply not enough to survive a motion to dismiss, as bias or even personal animus are not sufficient bases for actual malice. *See Dunlop-McCullen v. Rogers*, 2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002) ("actual malice not established where defendant engaged in poor journalistic practices, had a preconceived story-line, and failed to conduct thorough investigation, but did not entertain serious doubts about truth of statement") (citing *Tucker v. Fischbein,* 237 F.3d 275, 286 (3d Cir. 2001)); *1st Amend. Praetorian v. N.Y. Times Co.,* 2025 WL 949575, at *9-10 (S.D.N.Y. Mar. 28, 2025) (rejecting allegation that statements were published "as part of a preconceived…narrative"); *Harte-Hanks*, 491 U.S. at 665 ("motive in publishing a story…cannot provide a sufficient basis for finding actual malice."); *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020) (allegations of "improper political or personal biases do not establish actual

---

[12] In the interviews, Higgins restates the Book's arguments. In the *Casa Del Vanguard* podcast, for example, he states:

> I don't really know if they are being pushed to go to the right because of this or if their…shift to the right…is based in their actual politics. But, ultimately, I wonder if it really matters. [L]ike I argue in the book, it's not just a one to one. It's not that once Matt Taibbi got, you know, selected by Elon Musk for the Twitter Files that he kind of like went to the right, he was already on the right before that. Why had he gone to the right? Well, there are a lot of different factors that explain it. Part of it's audience. Part of it's the nuance of, like, getting older and having different politics and different experiences that change the way that you think about things. *See* Compl. ¶ 70 n.8 at 39:26.

malice without additional facts"). Indeed, though courts have enumerated the types of facts to plead actual malice, like a fabricated story or use of unverified anonymous sources, *see St. Amant,* 390 U.S. at 732, there are no such allegations here.

Finally, even on his second attempt, Plaintiff still fails to allege any facts about Hachette that could meet the heavy burden of actual malice. While he boldly alleges that the Book was not fact-checked—a completely unsubstantiated allegation belied by the pages of footnotes[13]— publishers are "entitled as a matter of law" to rely on an author's "reputation[] and experience," *McManus v. Doubleday & Co*., 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981), and are "not obligated to check every single fact in the Book," even under the less burdensome gross irresponsibility standard. *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 227 (S.D.N.Y. 1993); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382-83 (1977) (dismissing claim where publisher "placed its reliance upon [the author's] reportorial abilities"). Plaintiff has not alleged *any* reason for Hachette to doubt Higgins, thus its reliance on his reporting and "sterling reputation for accuracy" negates any claim of actual malice as a matter of law. *Masson*, 960 F.2d at 902; *Weber v. Multimedia Ent., Inc*., 2000 WL 526726, at *11 (S.D.N.Y. May 2, 2000) ("Unless there is a reason to doubt an author's credibility, the publisher is under no obligation to investigate.").

Plaintiff's failure to allege actual malice also mandates dismissal with prejudice.

## CONCLUSION

Defendants respectfully request that the Court grant their motion to dismiss, dismissing Plaintiff's complaint with prejudice, and for such other relief as it deems just and proper.

Dated:  February 17, 2026                              **DAVIS WRIGHT TREMAINE LLP**

---

[13] *See Wright v. Belafonte*, 2014 WL 13111397, at *10 (S.D.N.Y. Mar. 11, 2014) (allegation of "failing to fact-check" is "conclusory, and therefore need not be assumed to be true" on a motion to dismiss), *report and recommendation adopted*, 2014 WL 1302632 (S.D.N.Y. Mar. 31, 2014), *aff'd*, 687 F. App'x 1 (2d Cir. 2017).

/s/ Elizabeth A. McNamara

Elizabeth A. McNamara
Leena M. Charlton
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        leenacharlton@dwt.com

*Attorneys for Defendants Eoin Higgins
and Hachette Book Group, Inc.*