UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MATT TAIBBI,                                          :
                                                     :
                              Plaintiffs,            :        MEMORANDUM DECISION
                                                     :            AND ORDER
              -against-                              :
                                                     :        25 Civ. 9511 (GBD)
EOIN HIGGINS and BOLD TYPE BOOKS, *a division*  :
*of Hachette Book Group, Inc.*,                      :
                                                     :
                              Defendants.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiff Matt Taibbi ("Plaintiff") brings this action against Eoin Higgins and Bold Type

Books (collectively, the "Defendants"), alleging defamation *per se*.   Before this Court is

Defendants' motion to dismiss the complaint for failure to state a claim. (*See* Mot. Dismiss, ECF

No. 25.)   Because Plaintiff fails to allege an actionable defamatory statement, the motion is

GRANTED.

## I.    FACTUAL BACKGROUND

This action centers around *Owned: How Tech Billionaires Bought the Loudest Voices on*

*the Left* ("*Owned*" or the "Book"), a book authored by Higgins and published by Bold Type Books.

(Am. Compl. ¶ 1.) *Owned* purports to explore "how tech elites and formerly left-wing journalists

forged an alliance" to create a "new right-wing media ecosystem." Eoin Higgins, *Owned* 12

(2025).[1]

---

[1] This Court will consider the Book's contents as Plaintiff incorporated the Book by reference into his
complaint and the Book is central to Plaintiff's claims. *See Biro v. Conde Nast*, 883 F.Supp.2d 441, 455
(S.D.N.Y. 2012) (noting that "documents containing the allegedly defamatory statements" are incorporated
by reference and deemed part of the pleading).

As relevant here, the Book depicts Plaintiff as one of several independent journalists whose politics shifted in recent years to attract a more conservative audience. *Id.* at 128–29. Plaintiff began his writing career in post-Soviet Russia. *Id.* at 121–22. In 2004, Plaintiff joined *Rolling Stone*, where he gained acclaim reporting on "the big banks and the excesses of Wall Street" during the 2007–2008 financial crisis. *Id.* at 123. According to the Book, Plaintiff's image among liberal pundits declined after Plaintiff pushed back on allegations of Russian electoral interference in the 2016 presidential election and "old misogynistic writings resurfaced." *Id.* at 126–28. The Book claims that "[a]fter his rejection by the left, [Plaintiff] turned to a new right-wing audience and became increasingly beholden to their priorities." *Id.* at 129. In 2020, Plaintiff left *Rolling Stone* for Substack, a subscription-based newsletter service. *Id.* at 133–34.

In 2022, Elon Musk purchased the social media website Twitter (now known as X).[2] *Id.* at 179. The Book states that Musk, in an effort "to expose the rot at the core of the entire company," sought out reporters to review internal company documents. *Id.* at 181. These documents would purportedly "show[] how Twitter had responded to requests for censorship from the government and made decisions on questionable content." *Id.* at 182. Musk eventually offered Plaintiff the opportunity to review the "Twitter Files," so long as he published his reporting on the platform. *Id.* at 182.

On December 2, 2022, Plaintiff released his initial reporting on the Twitter Files. *Id.* Among other things, Plaintiff reported on "Twitter's decision to suppress a New York Post article on [Hunter Biden's laptop] in advance of the 2020 election," *id.*, and that the "Trump Administration routinely demanded material be taken down" by Twitter, *id.* at 185; (*see also* Am. Compl. ¶ 58.)

---

[2] The portions of the Book that discuss Plaintiff's career refer to the platform as Twitter. For consistency, this opinion will also refer to X as Twitter.

The Book asserts that due to the increased exposure Plaintiff gained from the Twitter Files project, Plaintiff's "Twitter account blew up, and his Substack—already incredibly successful—gained thousands of subscriptions." Higgins, *supra* at 186. The Book also claims that Plaintiff's Twitter Files reporting "generated a financial windfall." *Id.* Plaintiff pleads, however, that "during the second and third months of the project, [he] experienced 4,844 subscriber cancellations and a $20,644 loss in revenue, as readers [of his Substack] became frustrated that [he] was publishing his work on another platform." (Am. Compl. ¶ 39.) Altogether, 13.7% of Plaintiff's Substack subscribers joined after publication of his Twitter Files reporting. (*Id.* ¶ 38.)

In 2023, Musk asked Plaintiff to leave Substack and move to his new "Twitter Subs" platform., where Musk claimed that Plaintiff would "get far more subscribers." (*Id.* ¶ 42.) According to the Book, Musk made the offer after he instituted "a blanket search ban on Twitter of all Substack links." Higgins, *supra* at 195. Plaintiff refused Musk's offer, stating that "people would say I'm essentially an employee of Twitter and both of us would never hear the end of it" and that "the optics would be really bad, journalistic ethics-wise." (Am. Compl. ¶ 43.) Plaintiff alleges that after refusing Musk's offer, Musk immediately kicked him off of the Twitter Files project and Plaintiff's Twitter following was "frozen and deamplified." (*Id.* ¶ 45.)

On February 2, 2025, Higgins requested an interview with Plaintiff to discuss the yet to be published Book. (*Id.* ¶ 48.) Specifically, Higgins framed the interview as an opportunity to discuss "how [Plaintiff's] audience changed and, more broadly, how [Plaintiff] see[s] the left/right political landscape." (*Id.* ¶ 48.) Plaintiff declined with the message, "Lol. Pass." (*Id.*)

Bold Type Books published the Book on February 4, 2025. (*Id.* ¶ 1.) Plaintiff alleges that following publication, Higgins admitted that the Book does not contain evidence of a direct financial deal between Plaintiff and Musk. (*See id.* ¶¶ 56, 62, 65, 68–70.)

3

Plaintiff initiated this action on November 13, 2025. (ECF No. 1.) On February 3, 2026, Plaintiff filed an amended complaint. (Am. Compl.) The amended complaint alleges a single count of defamation *per se* and claims that several statements on the Book's front cover, spine, back cover, and inside flaps are "independent defamatory publications" that "do not merely summarize the Book's contents but affirmatively assert new factual accusations of financial corruption and professional misconduct." (*Id.* ¶ 77.)

Specifically, Plaintiff alleges that the following statements on the cover and inside flap are defamatory *per se*. These statements are as they appear in the Book, except that the bolded language in each statement is the language Plaintiff highlights in his amended complaint.

1. **"Owned."** (*Id.* ¶ 17, fig. 2;) Higgins, *supra* at Front Cover.

2. **"Bought."** (Am. Compl. ¶ 13;) Higgins, *supra* at Front Cover.

3. "Glenn Greenwald and Matt Taibbi's decades-long journey from the world of alternative journalism into the **snug patronage of billionaires** is a story with profound and troubling implications for the future of journalism and unfettered thinking." (Am. Compl. ¶ 18;) Higgins, *supra* at Back Cover.

4. "In recent years, right-wing billionaires like Elon Musk, Peter Thiel, Marc Andreessen, and David Sacks have turned to media as **their next investment and source of influence. Their cronies are Glenn Greenwald and Matt Taibbi** . . .. (Am. Compl. ¶ 20, fig. 3;) Higgins, *supra* at Left Flap.

5. "*Owned* **follows the money, names names**, and offers a chilling portrait of a future social media and news landscape." (Am. Compl. ¶ 24, fig. 3;) Higgins, *supra* at Left Flap.

4

6. "It is a **biting expose of journalistic greed**, tech-billionaire ambition, and a lament for a disappearing free press." (Am. Compl. ¶ 25, fig. 3;) Higgins, *supra* at Left Flap.

Throughout his complaint, Plaintiff also highlights several words and phrases within the Book that he claims are either independently defamatory or support a defamatory inference.

7. "Taibbi's Twitter Files reporting is a perfect example: he spent decades building up credibility and credentials only to, in one high-profile moment, **cash in** to **launder a CEO's cherry-picked corporate opposition file on his opponents**." (Am. Compl. ¶¶ 13, 37;) Higgins, *supra* at 9.

8. "**His Twitter account blew up, and his Substack—already incredibly successful—gained thousands of subscriptions. The reporting generated a financial windfall for the writer, even if its findings were dismissed by more sober commentators.**" (Am. Compl. ¶¶ 13, 37;) Higgins, *supra* at 186.

9. "**His Substack had exploded** after the Twitter Files reporting and he'd promised to continue exposing censorship of the social media site." (Am. Compl. ¶ 40;) Higgins, *supra* at 196.

10. "It was this **threat to Taibbi's bottom line** that finally motivated the journalist to act." (Am. Compl. ¶ 45;) Higgins, *supra* at 196.

11. "After years of confrontational commentary on the financial industry and questioning the mainstream, **Taibbi fully dispensed with any pretense of challenging power late in 2022**." (*Id.* ¶ 46;) Higgins, *supra* at 182.

On February 17, 2026, Defendants moved to dismiss the amended complaint for failure to state a claim and filed an accompanying memorandum of law. (Mot. Dismiss; Mem. L. Supp.

5

Mot. Dismiss ("Defs.' Mem."), ECF No. 26). On March 3, 2026, Plaintiff filed his memorandum of law in opposition. (Mem. L. Opp. Mot. Dismiss ("Opp."), ECF No. 30.) Defendants replied on March 16, 2026. (Reply, ECF No. 31.) On March 25, 2026, this Court heard oral argument on Defendants' motion. (ECF Minute Entry 03/25/2026.)

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When ruling on a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citing *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir 2013). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims merely "consistent" with liability are insufficient, and the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, 557. Where a state law claim is filed in federal court, a court must apply state substantive law and federal procedural law. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 416, 426–28 (1996). The parties agree that New York law governs Plaintiff's state law claim.

## III.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RELIEF

### A.  Defamation Law

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (citation omitted). Under New York law, a plaintiff alleging defamation must establish five elements: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a

6

third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Additionally, "a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Church of Scientology Intern. v. Behar*, 238 F.3d 168, 173–74 (2d Cir. 2001) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). While a jury must ultimately determine whether a plaintiff has been defamed, "[w]hether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000); *see also Biro*, 883 F.Supp.2d at 457 ("The New York Court of Appeals has explained that there is particular value in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" (quoting *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 (1995)).

"New York recognizes certain statements as defamatory per se, meaning they are actionable without pleading and proof of special damages." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (citation omitted). In New York, there are four established categories of *per se* defamatory statements: statements "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992); *see also Zherka v. Amicone*, 634 F.3d 642, 645 n.6 (2d Cir. 2011).

"Not all (or even most) maligning remarks can be considered defamatory." *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014). Under New York law, "[a]n expression of pure opinion is not actionable . . . no matter how vituperative or unreasonable it may be." *Steinhilber v. Alphonse*, 68

7

N.Y.2d 283, 289 (1986); *see also Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993) ("[F]alsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false."). A "pure opinion" is a statement of opinion that is either "accompanied by a recitation of the facts upon which it is based" or "does not imply that it is based upon undisclosed facts." *Steinhilber*, 88 N.Y.2d at 289. Further, New York law considers "imaginative expression" and "rhetorical hyperbole" as forms of pure opinion subject to New York constitutional protection. *See Celle*, 209 F.3d at 178; *Gross*, 82 N.Y.2d at 155 (noting that "assertions that a person is guilty of blackmail, fraud, bribery, and corruption could, in certain contexts, be understood as mere, nonactionable rhetorical hyperbole or vigorous epithets") (internal citations and quotation marks omitted). By contrast, a "mixed opinion . . . implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it" and is actionable. *Steinhilber*, 88 N.Y.2d at 289.

"In New York, the courts employ a flexible approach in distinguishing actionable fact from non-actionable opinion." *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 153 (2d Cir. 2000.) Courts consider:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Ganske v. Mensch*, 480 F. Supp. 3d 542, 552 (S.D.N.Y. 2020) (quoting *Gross*, 82 N.Y.2d at 153).

**B. The Book's Cover and Jacket**

None of the statements Plaintiff identifies on the Book's cover and jacket, standing alone, are actionable. Statements 1 and 2, the words "Owned" and "Bought" on the Book's front cover, are susceptible to both literal and metaphorical meanings depending on the surrounding context.

Plaintiff acknowledges, however, that the contents of the Book cannot support a literal reading, stating that the "[t]he Book contains no evidence of any financial transaction, payment, contract, or quid pro quo involving Plaintiff." (Opp. at 4.) In this context, "Owned" and "Bought" naturally read as attention-grabbing rhetoric used to signify Higgin's opinions and the Book's conclusions. Aside from the scattered words and phrases discussed below, Plaintiff does not dispute the accuracy of the vast majority of the Book's factual content that informs these views or point to language suggesting the opinions are based on facts other than those disclosed in the book. *See Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (noting that "hypothesis or conjecture . . . may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader"). Plaintiff may not like Higgins's subjective conclusions, or agree with their accuracy, but that does not make them actionable defamation.

Statement 3, that Plaintiff was in "the snug patronage of billionaires," is also a nonactionable opinion. Just like "Owned" and "Bought," the language "snug patronage" does not have a readily understood precise meaning, so there is no way for a reader to determine whether the statement is true or false. The statement also appears as a reviewer comment on the back cover under the heading "Praise for Owned." From this context, a reader would likely intuit this statement as an opinion of the reviewer, supported by the facts disclosed in the Book, and not a statement of fact about Plaintiff. *See Hammer v. Amazon.com*, 392 F. Supp. 2d 423, 431 (E.D.N.Y. 2005) ("[T]he average person understands that [book reviews] are the reviewer's interpretation and not 'objectively verifiable' false statements of facts." (quoting *Hammer v. Trendl*, No. CV 02-2462 (ADS), 2003 WL 21466686, at \*3 (E.D.N.Y. Jan. 18, 2003)).

Statement 4 is a passage from the Book's left flap that states that Plaintiff was one of the right-wing technology billionaires' "cronies." (Am. Compl. ¶ 20.) Courts in this district have

previously held that calling someone a "crony," without more, is nonactionable rhetorical hyperbole. *See Cassava Scis., Inc. v. Heilbut*, 2024 WL 553806, at *5 (S.D.N.Y. Jan. 5, 2024), *report and recommendation adopted sub nom. Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) (holding that a presentation which labeled individuals as "cronies" was nonactionable opinion); *cf. Biro*, 883 F. Supp. 2d at 463 ("[T]he use of the terms 'shyster,' 'con man,' and finding an 'easy mark' is the type of 'rhetorical hyperbole' and 'imaginative expression' that is typically understood as a statement of opinion.") (internal citation omitted). The same is true here. The assertion that Plaintiff is a billionaire's crony is the sort of excessive, unverifiable language that signals to a reasonable reader that they are reading the speaker's opinion, and not a statement of fact.

Statement 5 also appears on the left flap and states that the Book "follows the money, names names," and is a "biting expose of journalistic greed." (Am. Compl. ¶¶ 24–25.) Plaintiff alleges that "follows the money" and "names names" "represents to readers that the author has traced actual financial relationships and identified specific recipients of improper payments or patronage." (*Id.* ¶ 24.) "In New York, a plaintiff cannot sustain a libel claim if the allegedly defamatory statement is not 'of and concerning plaintiff' but rather only speaks about a group of which the plaintiff is a member." *Chau*, 771 F.3d at 129 (internal citation omitted). Statement 5 does not indicate that it is "of and concerning" Plaintiff—it describes Higgins's investigative process for all the Book's subjects, not only Plaintiff. A reasonable reader would, therefore, not interpret "follows the money" and "names names" as a false statement of fact about Plaintiff.

Statement 6 states that the Book is an "exposé of journalistic greed," which Plaintiff alleges "asserts professional dishonesty and unethical conduct." (*Id.* ¶ 25.) But whether someone is motivated out of greed or ambition is a subjective determination that is not capable of being proven

true or false. *See Rosa v. Eaton*, No. 23 CIV. 6087 (DEH), 2024 WL 3161853 (S.D.N.Y. June 25, 2024) ("[C]ourts have recognized that words like . . . 'greedy crooks' . . . are vague, imprecise statements of hyperbole considered nonactionable opinion.") Further, the context surrounding the statement, including its placement on the left flap of the Book's cover, clearly implies that the facts on which this opinion is based can be found within the Book. *Cf. Graham v. UMG Recordings, Inc.*, 806 F. Supp. 3d 454 (S.D.N.Y. 2025) (holding that an album's cover art shares the same overall context as the recording itself because the cover is "designed to reinforce the message of the [r]ecording." (internal citation and quotation marks omitted)).

Plaintiff acknowledges that these statements "might be protected opinion standing alone." (Opp. at 11.) But he claims that when viewed together, the statements on the Book's cover and jacket "become implied factual assertions that the accused was actually paid." (*Id.* at 12.) Plaintiff is correct that otherwise nonactionable statements may create "false suggestions, impressions, and implications," and that these false implications can serve as the basis of a defamation claim. *See Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380–81 (1995). But plaintiffs alleging defamation by implication must "make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author *intended or endorsed* that inference." *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 44 (N.Y. App. Div. 2014) (emphasis added).

Even assuming that Plaintiff has affirmatively alleged a defamation by implication claim— despite not labeling his sole cause of action as such—Plaintiff has failed to allege facts showing that Defendants intended or endorsed the defamatory inference. As stated above, Plaintiff admits that "the Book contains no evidence whatsoever that Plaintiff received payments, sponsorship, or financial inducement from Elon Musk or any other billionaire." (Am. Compl. ¶ 29.) Instead of

endorsing the alleged defamatory implication, the Book argues that Plaintiff's central reason for agreeing to participate in the Twitter Files was to "gain access." Higgins, *supra* at 182. Plaintiff also claims that Higgins "admitted contemporaneously that readers expecting proof of who was 'bought' would be disappointed." (Am. Compl. ¶ 62.) In short, the Book's contents and Higgins contemporaneous statements distance the Book from the defamatory implication Plaintiff alleges. *See Henry v. Fox News Network LLC*, 629 F.Supp.3d 136, 150 (S.D.N.Y. 2022) (finding that a corporate statement did not endorse a defamatory implication because the statement intentionally included "nebulous" phrasing). Without any additional facts pointing to Defendants' intent, Plaintiff's defamation by implication claim fails.

### C. Statements Within the Book

The alleged defamatory statements within the Book are also nonactionable. First, in statement 7, "cash in" and "launder" are directly preceded by a reference to the "decades" Plaintiff spent "building up credibility and credentials." Higgins, *supra* at 9. This context makes clear that the Book's reference to "cash in" is not referring to literal money, but rather the idea that Plaintiff traded his reputation for access to the Twitter Files. This sort of loose, figurative language would naturally lead a reasonable reader to interpret this as a statement of opinion.

Similarly, statement 8 is a nonactionable subjective determination. Statement 8 claims that Plaintiff's Substack "gained thousands of subscriptions" following his work on the Twitter Files, which translated to a "financial windfall." But as Plaintiff's counsel acknowledged during oral argument, this statement, "in the abstract," is not defamatory because it does not tend to injure Plaintiff's reputation. Oral Arg. Tr. at 44:13–17; *see also Chau*, 771 F.3d at 127 ("To be actionable . . . the statement must do more than cause discomfort or affront; the statement is measured not by the sensitivities of the maligned, but the critique of reasonable minds that would think the speech attributes odious or despicable characterizations to its subject.") And even if one could read a

12

defamatory meaning into these words, Plaintiff admits that he did in fact gain thousands of Substack subscribers following the Twitter Files reporting. (*See* Am. Compl. ¶¶ 38–39 ("The 'thousands' of new subscribers *Owned* claims Plaintiff gained after publication represented only a small percentage of Plaintiff's overall readership.")) Whether this "small percentage" of increased subscribers represented a "financial windfall" is a subjective determination.

Statements 9, 10 and 11 are also nonactionable opinions. Statement 9 claims that Plaintiff's Substack "exploded" following the Twitter Files. Just like the term "financial windfall," whether something "exploded" in value is a subjective determination. Finally, neither Statement 10, which states that Plaintiff was motivated by a "threat to [his] bottom line," (Am. Compl. ¶ 45,) or Statement 11, which claims that "Plaintiff fully dispensed with any pretense of challenging power late in 2022," (*id.* ¶ 46,) are capable of being proven true or false. What motivated Plaintiff to leave Twitter and whether he adequately challenged power are matters of opinion.

Because Plaintiff has failed to adequately allege a defamatory statement or implication, his defamation *per se* claim is dismissed.

## IV.    CONCLUSION

Defendants' motion to dismiss, (ECF No. 25), is GRANTED. The Clerk of Court is directed to close the open motions and the case accordingly.

Dated: May 5, 2026
New York, New York

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

13